**HUMANE SOCIETY OF ROCHESTER AND MONROE COUNTY FOR the PREVENTION OF CRUELTY TO ANIMALS, INC., Douglas D. Burdick and Mary Jane Burdick, Plaintiffs,**

v.

**Richard E. LYNG, in his Official Capacity as Secretary of the United States Department of Agriculture; and Milton Hertz, in his Official Capacity as Acting Administrator of the Agricultural Stabilization and Conservation Service of the United States Department of Agriculture, Defendants.**

### No. CIV–86–307T.

United States District Court,
W.D. New York.

April 16, 1986.

Dutcher, Witt & Sidoti (Henry R. Dutcher, Joseph H. Gordon and Peter C. Lovenheim, of counsel), Rochester, N.Y., for plaintiffs.

Terrence Jackson, U.S. Dept. of Agriculture, Office of the General Counsel, Shalom Brilliant, U.S. Dept. of Justice, Washington, D.C. (Jonathan W. Feldman, Asst. U.S. Atty., of counsel), Rochester, N.Y., for defendants.

## DECISION and ORDER

TELESCA, District Judge.

Plaintiffs in this action seek to have me convert the temporary restraining order I issued on April 4, 1986 into a preliminary injunction. Defendants oppose plaintiffs' motion, and have cross-moved to dismiss the action. For the reasons set forth below, the temporary restraining order is converted to a preliminary injunction, and defendants' motion to dismiss is denied.

## BACKGROUND

The plaintiffs challenge the administratively prescribed method for branding cattle under the Dairy Termination Program ("DTP") as amended by the Food Security Act of 1985, P.L. 99–198. Under the program, the Commodity Credit Corporation ("CCC") is authorized to enter into contracts with producers of milk in the 48 states of the continental United States who agree to sell for slaughter or export all dairy cattle in which they have an interest and who, for a period of five years, agree not to acquire any interest in dairy cattle or the production of milk. Despite earlier measures to discourage over-production of milk, including the earlier Dairy Diversion

Program and the freezing or reduction of the support price, the problem of milk supply exceeding commercial demand persisted. Thus to ensure a permanent reduction in milk production, and reduce the imbalance between supply and demand in the milk market, Congress established the Dairy Termination Program. See H.R.Rep. No. 99–271(I), 99th Cong., 1st Sess. 20–21, reprinted in [1985] U.S.C.Cong. and Ad. News 1103, 1124–25.

Thus, as amended by the 1985 Act, 7 U.S.C. § 1446(d)(3) the Secretary of Agriculture is to establish and carry out the DTP for the 18 month period beginning April 1, 1986. Simply stated, any farmer who is accepted into the program, ultimately will be out of the dairy production business.

In implementing the program, the Secretary is authorized by the Act to issue a regulation requiring some method of identifying cattle subject to such contracts. In furtherance thereof, the Deputy Administrator, State and County Operation, adopted U.S. Department of Agriculture Notice LD–249 which provides that all female dairy cattle in the DTP program shall be branded within 15 days after the dairy farmer is notified that he has been accepted in the program. That document provides "All female dairy cattle must be branded with a hot branding iron. Freeze, chemical, or other branding methods are not acceptable." The plaintiffs attack that aspect of the publication claiming that it is arbitrary and capricious because it is inherently inhumane and therefore an unreasonable method of marking or identifying those cows earmarked for removal from production. The plaintiffs claim that the Government's rigid adherence to a plan of marking cows which calls for facial branding by hot-iron method, is unreasonable, arbitrary and capricious when another method or other methods which would not involve as much pain to the animal and are equally effective are not permitted under the plan.

## FACTS

At this stage of the proceeding, the facts appear as follows. Plaintiff, Humane Society of Rochester and Monroe County for the Prevention of Cruelty to Animals, Inc. is a special corporation with a statutory charge to prevent and prosecute cruelty against animals. Some members of its staff are empowered as peace officers under New York Criminal Procedure Law § 2.10 and New York Agriculture and Markets Law § 371. In addition, under New York Not For Profit Corporation Law § 1403, plaintiff as a corporation for the prevention of cruelty to animals is specifically authorized to "... prefer a complaint before any court, tribunal or magistrate having jurisdiction, for the violation of any law relating to or affecting the prevention of cruelty to animals, and may aid in presenting the law and facts to such court, tribunal or magistrate in any proceeding therein." Plaintiffs Douglas D. Burdick and Mary Jane Burdick are dairy farmers who have been accepted into the Dairy Termination Program at issue in this case.

Plaintiffs specifically challenge the hot-iron face branding regulation published by defendants as U.S. Department of Agriculture Notice LD–249. They argue primarily that the regulation is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). They also argue that the regulation was not published as required by 5 U.S.C. § 552, that it contravenes New York State laws against animal cruelty, New York Agriculture and Markets Law § 353, and that it constitutes an impermissible delegation of rulemaking authority.

At a preliminary injunction hearing held April 14th and 15th, 1986, plaintiffs presented eight witnesses. The first, Dr. Charles E. Short, D.V.M., a professor at Cornell University, testified that hot-iron facial branding was painful, could damage underlying facial structure (muscles used in chewing, salivary glands, and eyes), and that, because of the extent of enervation of the facial area, hot-iron branding was an "inhumane approach." He clearly outlined

the potential for significant harm to the cows particularly if the branding process was inappropriately conducted.

Plaintiffs' second witness, Dr. Theodore H. Friend, a professor of applied animal behavior (his specialty is animal stress physiology) at Texas A & M University, testified regarding "freeze-branding" as an alternative to hot-iron branding. In freeze-branding, a branding iron is submerged in liquid nitrogen until it reaches the temperature of that nitrogen (–320 degrees F). It then is applied to the cow for 40 seconds, and causes short-term hair loss in the branded area, and eventually the hair grows back in white. However, if the brand is applied for 60 seconds, it causes permanent hair loss like a hot-iron brand. Dr. Friend testified that a freeze brand is just as visible on a white cow as a fire brand is on a black cow, from a distance of 40 to 50 feet. He testified that in his experience, no infections had ever resulted from freeze-branding, and the brand healed in approximately four weeks with only some itching. He testified that it was easier to freeze-brand, because a farmer could tell when the brand was cold enough when the nitrogen stopped bubbling, whereas only much practice could enable one to tell when a hot-iron brand was hot enough.[1] He also testified that, although a cow might react to a freeze-brand for a few seconds, the cow would become quiet almost immediately thereafter as the surrounding skin became numb.

Dr. William D. Whittier, D.V.M., a professor at V.P.I. College of Veterinary Medicine, testified that he prefers a freeze-brand because it is more legible and causes less pain to animals. Although Dr. Friend had testified that a brand should not be applied to the face of a cow (but if it were, that a freeze-brand should be used), Dr. Whittier had "no difficulty" with a freeze-brand applied to the face. He agreed that it was easier to use than a hot-iron because of the ability to tell when the iron had reached the proper temperature. He also

felt it was easier because a farmer need only immobilize the head of a cow with, for example, a rope halter or a head catch, whereas "squeeze chutes" were recommended for hot-iron branding. He felt that any problem with visibility of freeze-brands on white-faced cows could be overcome by applying the brand for a longer time to remove the hair permanently. He also had had no experience with infections resulting from freeze branding. Although Dr. Friend felt that dairy farmers were more likely to have used freeze-brands than hot-iron brands, Dr. Whittier felt they were about equally common. He used dry ice rather than liquid nitrogen to cool the brand, and in his experience it took 30 to 35 seconds to brand a black cow, 40 to 45 seconds to brand a red cow, and 1¼ to 1½ minutes to brand a white cow.

Robert W. Birkenhauer of the Hasco Company, a manufacturer of cattle tags, also testified for plaintiffs. He testified that his company made both metal and plastic I.D. tags and notchers which could mark a cow by taking a notch out of its ear. He also produced a tattooing tool which would produce a two inch green tattoo in a cow's ear by perforating the skin on the ear and filling the perforation with dye. He testified that this brand would be visible from approximately 30 feet.

Dr. Short was then recalled as a witness. He testified that, based on the testimony of the other witnesses, freeze-branding would be preferable to hot-iron branding because it was less painful. He testified that it would be better to brand on the body of a cow rather than her face, and that he would recommend anesthesia before any face branding. He felt that tatoos were an acceptable alternative to branding, because they were easy, healed rapidly, resulted in minimal infection, and, in his experience, remained visible for 10 to 12 years.

Frank Rogers, the Executive Director of the plaintiff Humane Society of Monroe County, testified that his organization, which was incorporated in 1888, has up-

---

1. Of course, this wouldn't be the case if the branding iron was electric thermostatically con-

trolled, but LD–249 makes no mention of such a device.

wards of 7,000 members. Ronald Storm, the Chief Cruelty Investigator of the Humane Society of Rochester, testified that he would consider hot-iron branding on any part of a cow a violation of § 353 of the New York Agriculture and Markets Law. He also testified that, as far as he knew, no one had ever been prosecuted in New York for hot-iron branding. Dr. John F. Kullberg, the President of the American Society for the Prevention of Cruelty to Animals, testified that his organization, which was chartered in 1866, had upwards of 200,000 members nationwide, and that it was clear to him that hot-iron face branding constitutes absolute cruelty to an animal when less painful alternatives are available.

Finally, plaintiff Douglas Burdick, a dairy farmer, testified that he was unwilling to hot-iron brand his cows on the face, in part because he feared prosecution by anti-cruelty organizations, and in part because he had experienced difficulties with a similar method of de-horning cows.

Dr. Lee E. Miller, D.V.M., testified on the Government's behalf. Unlike any of plaintiffs' witnesses, Dr. Miller had considerable experience with hot-iron face branding. He testified that there was no need for a squeeze chute, but only that the head of the cow need be immobilized. He also testified that the hot-iron did not seem to bother the cow after one second, that it did not cause any cows to lose milk producing capability and it did not instill fear of humans in the cow. He testified that freeze-branding, by contrast, caused facial swelling not caused by hot brands. In his judgment, hot branding was preferable because freeze-branding took much longer, the liquid nitrogen could cause freeze burn to the farmer or the cow, and could not be controlled as easily as an electric, thermostatically controlled hot-iron. In his experience, tatoos caused a far greater reaction from the cow because ears are more sensitive, tatoos get faint and difficult to read over time, and infection (especially by contagious warts) is much easier. He noted that he had seen hot-iron brands applied in the West become infected and/or smudged if

the branding iron were heated on a fire too long or held on the cow too long. He found either type of brand equally difficult to camouflage. He testified that an electric branding iron (which costs $73.00) was needed for proper hot-iron branding, and probably should be applied by persons familiar with its use. After two weeks of hot-iron branding considerable numbers of cows on the jaw, he had noted no infections in any of them.

Richard C. Call, a dairy farmer from Genesee County, New York, testified that he had branded approximately 700 cows in his herd with an electric iron. Although he had never branded cows before, he was able to brand his cows with little difficulty by closing the stall around the head of the cow, gripping the cow's nose with a nose lead (a device compared to a pair of pliers), and branding the cow. His cows would react for one to two seconds, but would be able to eat normally the same afternoon they were branded. None of his cows developed infections from the hot-iron, and Mr. Call preferred the hot-iron because it was quicker and there was no risk of spilled liquid nitrogen.

Jerry Newcomb, the Administrator of the Dairy Termination Program, testified for defendants that he was responsible for the development of LD–249. He developed the regulation with the help of a veterinarian, Dr. Billy Johnson of the Animal and Plant Health Inspection Service (APHIS), and other staff members. He testified that the Department of Agriculture needed an immediate program which would result in visible, recognizable, and permanent identification of dairy cows to be taken out of production, because there was a concern about these cows being diverted (as had occurred under the predecessor Milk Diversion Program). He testified that pain to the animal was taken into consideration by the Department when looking at alternatives, and that, in particular, the Department had rejected freeze-branding as an alternative in part because of the additional stress caused to the animal by the lengthy branding process. He specifically stated

that hot-iron branding was the only available alternative which effectively served the Program's purposes of identifying cows by a recognizable, permanent, and visible mark. Dr. Billy Johnson's testimony was essentially in agreement but added that LD–249 was patterned after the hot iron branding practices from one of the western states.

## DISCUSSION

### I. Standing

At the outset, I hold that all plaintiffs have standing to bring this action. The Humane Society is specifically authorized under New York State law to prosecute violations of animal cruelty laws. This differentiates it from the plaintiffs in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Other courts have specifically recognized standing for animal protective societies in similar cases. *See, e.g., Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *Committee for Humane Legislation v. Richardson*, 540 F.2d 1141 (D.C.Cir. 1976). The Burdicks' interests are evident: under the challenged regulation, they are forced against their will to brand their cows on the face with a hot-iron, and thereby expose themselves to the risk of prosecution for animal cruelty.

### II. 15 U.S.C. § 714b

As I noted in my Temporary Restraining Order, 15 U.S.C. § 714b prohibits injunctions (mesne or final) against the Commodity Credit Corporation (CCC). Although the Commodity Credit Corporation runs the Dairy Termination Program, it delegated responsibility for the development of branding regulations to the Agricultural Stabilization and Conservation Service (ASCS), which is under the auspices of the Soil Conservation Service (SCS) under 16 U.S.C. Chapter 3B, specifically § 590h(b).

Because the ASCS was under the auspices of the SCS rather than the Commodity Credit Corporation, I held that the prohibition of 15 U.S.C. § 714b did not apply to this action.

Defendants argue that, in this instance, the ASCS is under the control of the CCC in implementing the branding regulations, and that an injunction against the branding regulations will effectively amount to an injunction against the CCC's DTP program. I disagree. This injunction is designed only to prevent the implementation of LD–249 as it now stands. The injunction need have no effect on the CCC's DTP program.

### III. Reviewability

Defendants argue that LD–249 is unreviewable because of 5 U.S.C. § 701(a), which states that the judicial review provisions of the Administrative Procedure Act do not apply to the extent that:

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

Reviewability under § 701(a)(1) was specifically addressed by the Supreme Court in *Heckler v. Chaney*, —— U.S. ——, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The Court reiterated its holding in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), that the exception of § 701(a)(1) is not available unless there is a showing of clear and convincing evidence of a legislative intent to restrict access to judicial review. 105 S.Ct. at 1655. Defendants have made no showing in this case that the governing statutes preclude judicial review of their actions in this case. Similarly, the Court in *Chaney* followed its earlier decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that, except as regards an agency's decision to undertake or not undertake certain enforcement actions, the exception of § 701(a)(2) is "a very narrow exception ... applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." 105 S.Ct. at 1655. As will be set

forth below, I find ample law to apply in this instance, and thus I am not convinced that § 701(a)(2) should be invoked here so as to render LD–249 unreviewable.

## IV.   5 U.S.C. § 706

The Supreme Court defined the standard of review under 5 U.S.C. § 706(2)(A) in *Motor Vehicle Mfrs. Association v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given." [Citations omitted.]

103 S.Ct. at 2867.

It has long been the public policy of this country to avoid unnecessary cruelty to animals.  Beginning with New York State in 1828, all 50 states and the District of Columbia had adopted anti-cruelty laws by the year 1913.  Animal Welfare Institute, *Animals and Their Legal Rights* 13–14 (1978).  The Federal Government likewise has enacted anti-cruelty laws, such as the Twenty-Eight Hour Law, 45 U.S.C. § 71 et seq. (governing transport of livestock by rail), the Humane Methods of Slaughter Act, 7 U.S.C. § 1901 et seq., and the Animal Welfare Act, 7 U.S.C. § 2131 et seq. (governing laboratory animals, as well as shipments of animals and treatment of animals in zoos).  The Food Security Act of 1985, the very statute under which the DTP was created, strengthened the safeguards of the Animal Welfare Act.  All of these statutes are administered by the USDA.  Even the government's attorney conceded that if the avoidance of unnecessary cruelty to animals is not already government policy, it should be.

In the face of this public policy, the testimony before me indicates that defendants have obviously entirely failed to consider an important aspect of the problem before them when they drafted LD–249.  Defendants argue that they considered the aspect of cruelty to animals specifically when they rejected freeze-branding.  I reject this as not credible.  The testimony before me establishes that freeze-branding causes less stress to the cow than hot-iron branding.  Moreover, the predominant concern of defendants with the length of time taken to freeze-brand appears to be based more on inconvenience to farmers than on inconvenience to cows.

Most importantly, if cruelty to animals were indeed a consideration, LD–249 would not be drafted the way it is.  The only testimony before me that hot-iron face branding was not unnecessarily cruel came from defendants' witnesses who had employed electric, thermostatically controlled hot-iron brands.  Yet LD–249 is written to require farmers to brand solely with a hot-iron, whether or not they have access to an electric branding iron.  It advises farmers that they can brand their cows by heating any three inch strip of iron, whether over a fire or with a blow torch then applying it to the cow twice to get an "X".  Farmers are advised that an overheated iron can cause hair to burn which is particularly dangerous because the brand is being applied just below the cow's eye.  Yet farmers are advised to keep on trying until they get it right.  LD–249 clearly does not reflect the views of an agency which gave serious consideration to the prevention of cruelty to animals.

Accordingly, I find that plaintiffs have established a likelihood of success on the merits of their claim that LD–249 is arbitrary and capricious.  Because I so find, I do not address the merits of plaintiffs' claims that LD–249 contravenes state anti-cruelty statutes, was enacted without publi-

cation in violation of 5 U.S.C. § 552, or constitutes an impermissible delegation of authority to the ASCS.

I further find that irreparable harm would result to plaintiffs if an injunction were not granted. On the testimony before me, the hot-iron face branding of cows appears to constitute a violation of the state anti-cruelty laws which the Humane Society is sworn to prevent. In addition, by branding their cows, the Burdicks would expose themselves to prosecution for violation of New York Agriculture and Markets Law § 353. Even more important is the prospect of not qualifying for the program if they fail to brand their cows within 15 days of acceptance. Membership in the program is limited to those applicants accepted as of April 1, 1986.

## CONCLUSION

It is evident to me, as it should have been to the Department of Agriculture, that the type of branding espoused in LD–249 constitutes cruelty to animals. If the ASCS had been as concerned with cruelty to animals as they now claim to be, LD–249 would never have been adopted. The testimony before me clearly establishes that freeze-branding is a viable alternative to hot-iron branding since it causes less pain to cows and accomplishes all of the objectives outlined by defendants. Had defendants truly been concerned with preventing unnecessary cruelty to animals, they would have at least allowed farmers the option of either method.

Accordingly, it is hereby

ORDERED, that pending trial on the merits of this action, defendants are preliminarily enjoined from enforcing the hot-iron facial branding provisions of the United States Department of Agriculture Notice LD–249, and are directed to use existing lists of participating farmers to advise them of such direction; and it is further

ORDERED, that the posting of security be waived.