INTERNATIONAL PRIMATE PROTECTION LEAGUE, a non-profit corporation; Animal Law Enforcement Association, a corporation; People for Ethical Treatment of Animals, Inc., a corporation; Alex Hershaft; Pamela Chapman; Jo Shoesmith; Virginia Bourquardez; Peter W. Solem, Esq. and Bertha K. Solem; and Sherryl R. Thomas, for themselves and the class, Appellants,

v.

INSTITUTE FOR BEHAVIORAL RESEARCH, INC., a corporation or its successors in interest and as agents and officers; Richard W. Swain, Jr., Sergeant, Montgomery County Police; and National Institutes of Health; Animal Laboratory, Poolesville, Maryland, a branch of the Public Health Service, Department of Health and Human Services and their successors, Appellees.

and

James V. Stunkard, D.V.M., Defendant.

No. 86–1508.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1986.

Decided Sept. 4, 1986.

Rehearing and Rehearing En Banc Denied Oct. 7, 1986.

Md., Breckinridge L. Willcox, U.S. Atty., Charles P. Scheeler, Asst. U.S. Atty., Baltimore, Md., on brief), for appellees.

(Richard E. Verville, Peter S. Leyton, Grace Powers Monaco, Rebecca L. Burke, White, Fine & Verville, Washington, D.C., on brief), for amici curiae.

Before WIDENER, ERVIN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge.

In this case we must decide whether a group of private individuals may challenge a medical researcher's compliance with federal standards for the care of laboratory animals. Because we find that the plaintiffs lack standing to bring such a lawsuit, we affirm the judgment of the district court in its dismissal of this action.

To imply a cause of action in these plaintiffs might entail serious consequences. It might open the use of animals in biomedical research to the hazards and vicissitudes of courtroom litigation. It may draw judges into the supervision and regulation of laboratory research. It might unleash a spate of private lawsuits that would impede advances made by medical science in the alleviation of human suffering. To risk consequences of this magnitude in the absence of clear direction from the Congress would be ill-advised. In fact, we are persuaded that Congress intended that the independence of medical research be respected and that administrative enforcement govern the Animal Welfare Act.

## I.

The principal complainant in this case, Alex Pacheco, first met the principal defendant, Dr. Edward Taub, in May 1981.[1] Pacheco, an undergraduate student in the program of Environmental Studies at George Washington University in Washington, D.C., had worked frequently for the protection of animals, participating in projects of the Fund for Animals, the

Edward L. Genn (Gilbert J. Genn, Rockville, Md., on brief) for appellants.

Robert B. Lanman, Legal Advisor, Nat. Institutes of Health, Dept. of Health and Human Services, and Edgar H. Brenner (Arnold & Porter, Washington, D.C., James R. Miller, Miller & Steinberg, Rockville,

1. Because the district court granted a motion to dismiss, we construct our account from the material allegations of the complaint. *Allen v. Wright,* 468 U.S. 737, 767 n. 1, 104 S.Ct. 3315, 3320 n. 1, 82 L.Ed.2d 556 (1984) (opinion of Justice Brennan).

Friends of Animals, the Ohio Capital Area Humane Society, and the Alaska Department of Fish and Wildlife. He had founded the Ohio Animal Rights Committee and, in Washington, D.C., had founded People for the Ethical Treatment of Animals, Inc. (PETA), on which he continued to serve as director. Taub, the chief of the Behavioral Biology Center of the Institute of Behavioral Research (IBR), was studying the capacity of monkeys to learn to use a limb after nerves had been severed. Funded by the National Institutes of Health (NIH), the project amplified Taub's earlier research in this area and attempted to discover benefits for the rehabilitation of human patients suffering from a serious neurological injury such as a stroke.[2]

Pacheco offered to work as a volunteer for Taub on the neurological study at an IBR facility in Silver Spring, Maryland. Taub gave Pacheco the keys to the premises and permission to enter at any time, and Pacheco came regularly to the laboratory during the summer of 1981. He concluded from his observations that IBR did not provide the monkeys with sufficient food or water, a sanitary environment, or adequate veterinary care. On several nights during the week of August 27, 1981, Pacheco brought other researchers to IBR to confirm his impressions. Collecting affidavits from these visits with his own statement and photographs of the laboratory, Pacheco asked Sgt. Richard W. Swain, Jr. of the Montgomery County Police Department to investigate IBR for violations of Article 27, § 59 of the Maryland Code, which defines the criminal misdemeanor of cruelty to animals and authorizes a maximum imprisonment of ninety days and a maximum fine of $1,000 for each offense.

Swain obtained a search warrant from the Circuit Court for Montgomery County and on September 11 seized from IBR the seventeen monkeys in the experiment. Nine days later, the Assistant State's Attorney for Montgomery County filed criminal charges against Taub in the county District Court, alleging seventeen violations of the animal cruelty statute.

On October 9 the Circuit Court for Montgomery County, without opposition from IBR, instructed Sgt. Swain and Dr. James Stunkard, a veterinarian, to supervise the transfer of the monkeys to an NIH facility in Poolesville, Maryland that Swain and Stunkard had chosen as the best place for temporary care and custody. The order was to remain in effect "until further Order of this Court or the termination of the pending criminal prosecution against Dr. Taub, whichever occurs first."

Dr. Taub stood trial in November 1981 in the District Court for Montgomery County, which on December 2 entered orders of conviction on six of the seventeen counts and acquittal on the other eleven counts. Fearing that the court order on custody of the monkeys would partially expire with the acquittals, PETA acted quickly to prevent the return of any animals to IBR. Along with the International Primate Protection League, the Animal Law Enforcement Association, and several named individuals, PETA filed a bill of complaint on December 3 in the Circuit Court for Montgomery County. The complaint, in which the plaintiffs purported to speak for "their own and class interests and as next friends of seventeen (17) non-human primates,"[3] alleged that a civil inquiry would show IBR violations of the Maryland animal cruelty laws which the criminal trial had not established and further alleged that IBR had violated the federal Animal Welfare Act, 7 U.S.C. §§ 2131 et seq. Naming IBR, NIH,

2. See, e.g., Cohn, Jackniunas & Taub Summated Cortical Evoked Response in the Deafferentated Primate, 178 Science 1113 (1972); Taub, Ellman & Berman, Deafferentation in Monkeys: Effect on Conditioned Grasp Response, 151 Science 593 (1966); Taub, Bacon & Berman, The Acquisition of Trace-Conditioned Avoidance Response After Deafferentation of the Responding Limb, 58 J. of Comparative & Physiological Psychology 275

(1965); Knapp, Taub & Berman, Effect of Deafferentation on a Conditioned Avoidance Response, 128 Science 842 (1958).

3. One of the original seventeen monkeys died before the complaint was filed. We understand that one other monkey has since died and that fifteen animals are now involved.

Swain, and Stunkard as defendants, the plaintiffs asked the equity court to verify these claims, to designate the plaintiffs as new guardians of the monkeys, and to enjoin all parties from permitting IBR to regain possession.

On December 17, NIH requested removal of the case to the U.S. District Court for the District of Maryland. The plaintiffs did not oppose removal; as the complaint had noted, the claims arising under the Animal Welfare Act supported federal jurisdiction. Within two days, IBR moved to dismiss the action because the plaintiffs lacked standing to sue and within two weeks, NIH moved to dismiss the action for improper venue or to transfer the case to the U.S. District Court for the District of Columbia for consolidation with Civil Action No. 81–2691, *Humane Society of the United States v. Block*, and Civil Action No. 81–2977, *Fund for Animals v. Malone*. The plaintiffs in the former case, including PETA, hoped to require the Secretary of Agriculture to enforce against Taub and IBR the provisions of the Animal Welfare Act. The plaintiff in the latter case sought a more general declaration of the duties of Secretary Block and NIH to control the research treatment of animals and also requested an injunction to prevent the return of the seized monkeys to Taub and IBR.

Before the federal district court in Maryland ruled on the motion to consolidate, the federal district court in Washington, D.C. dismissed *Humane Society v. Block* and *Fund For Animals v. Malone*. In an April 1982 decision the court described the enforcement authority of NIH and Department of Agriculture officials as "wholly discretionary" and held that "given the absence of any express statutory directive requiring enforcement action where certain standards of care are not met, there is no duty owed to members of these plaintiff organizations nor can such a duty be implied."

Meanwhile, the Maryland criminal prosecution also moved toward resolution. Taub appealed his six District Court convictions to the Circuit Court for Montgomery County, where a jury after a new trial returned a verdict against Taub on one count of cruelty to animals. The Court of Appeals of Maryland then granted a writ of certiorari and in August 1983 reversed the conviction, holding that Article 27, § 59 of the Maryland Code did not apply to an institution conducting medical research pursuant to a federal program. *Taub v. State*, 296 Md. 439, 463 A.2d 819 (1983).

With the conclusion of the other federal cases and with the expiration of the October 9, 1981 order upon the termination of criminal proceedings, this suit became the only remaining litigation about the custody of the monkeys. In January 1985 a federal magistrate in the District of Maryland recommended that the district court dismiss for lack of standing the suit against IBR, NIH, and Swain. (The parties had earlier stipulated to the dismissal of Stunkard.) Three months later, the district court adopted the report and recommendation of the magistrate. When the district court refused in November to set aside the judgment, the plaintiffs appealed to this court. We affirm.

## II.

■ In order to sue in federal court, plaintiffs must show that they "personally [have] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Plaintiffs argue that they would suffer both financial and non-financial injuries if IBR regained control of the monkeys. Close examination of the allegations, however, shows that the claims do not provide standing for the plaintiffs.

Plaintiffs assert that this case implicates their financial interests in two different ways. First, they argue that their tax payments entitle them to ensure that the law is respected by NIH, a federal agency, and by IBR, a recipient of federal funds. The Supreme Court rejected this reasoning in *United States v. Richardson*, 418 U.S. 166, 174–75, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678

(1974), holding that payment of taxes does not purchase authority to enforce regulatory restrictions. *See generally Valley Forge College v. Americans United for Separation of Church and State,* 454 U.S. 464, 476–82, 102 S.Ct. 752, 760–64, 70 L.Ed.2d 700 (1982). Second, plaintiffs argue that they contributed to the maintenance of the monkeys after Sgt. Swain seized the animals and before NIH took possession. But as the transfer receipt shows, this expenditure represented a voluntary offer to help the Maryland authorities. The plaintiffs did not acquire any interest in the monkeys, who remained the property of IBR and in the legal custody of Sgt. Swain. Like attorneys' fees or other litigation costs, the maintenance payments were part of the response to the contested conduct, not part of the conduct itself, and therefore do not establish "a personal stake in the outcome of the controversy." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The plaintiffs also assert that this case implicates their non-financial interests in two ways. On the more general level, the plaintiffs sought standing by describing themselves as

> individuals and members having a personal interest in the preservation and encouragement of civilized and humane treatment of animals, whose own aesthetic, conservational, and environmental interests are specifically and particularly offended and affected by the matters hereinafter described, and which interests, along with their educational interests, will be detrimentally impacted upon if the relief sought is not granted.

This statement of interest resembles the pleading that the Supreme Court found to be inadequate in *Sierra Club v. Morton,* 405 U.S. 727, 735 n. 8, 92 S.Ct. 1361, 1366 n. 8, 31 L.Ed.2d 636 (1972). The Court held that "a mere interest in a problem; no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself" to create standing. *Id.* at 739. That conclusion applies precisely to these plaintiffs' asserted commitment to the hu-

mane treatment of animals. The commitment of an organization may enhance its legislative access; it does not, by itself, provide entry to a federal court.

Plaintiffs try to distinguish *Sierra Club v. Morton* by presenting a second, more specific, form of non-financial injury: the disruption of their personal relationship with these monkeys by the return of the animals to IBR. This theory seeks to compare plaintiffs with the parties who suffer injury from the disturbance of national parks or forests. because they use those areas. *Cf. Sierra Club v. Morton,* 405 U.S. at 735 n. 8, 92 S.Ct. at 1366 n. 8. But that analogy fails because these plaintiffs have been with the monkeys primarily because of this litigation. Whereas the parties described in *Sierra Club v. Morton* could use the park if the defendants complied with the law, these plaintiffs could not see the monkeys in the IBR laboratory if the defendants satisfied all requirements of care. *See also Animal Welfare Institute v. Kreps,* 561 F.2d at 1008; *American Horse Protection Association v. Frizzell,* 403 F.Supp. 1206, 1214 (D.Nev.1975).

This situation is like that in *Animal Lovers Volunteer Association (ALVA) v. Weinberger,* 765 F.2d 937 (9th Cir.1985), in which an organization challenged the treatment of goats in a federal enclave. The court found that the plaintiff had suffered no injury because its members could not be with the goats and therefore could not claim the direct personal involvement necessary for standing. "ALVA's injury is abstract at best," the court ruled, "and insufficient to remove ALVA from the category of concerned bystander." *Id.* at 939. The same principles govern the relationship of these plaintiffs to the monkeys and establish that they, too, have not sustained an injury on which to predicate standing.

## III.

■ Not only do plaintiffs fail to allege cognizable injuries; they fail also to prove that the implicated federal statute authorizes their right to seek relief. The two

shortcomings provide related, though alternative, bases for dismissal of this action.

The Animal Welfare Act, 7 U.S.C. §§ 2131 et seq., is the federal statute on which plaintiffs rely in defining their allegations of mistreatment. The Act seeks to insure that "animals intended for use in research facilities ... are provided humane care and treatment." 7 U.S.C. § 2131(1). There is no indication, however, that Congress intended this goal to come at the expense of progress in medical research. To the contrary, both the language of the statute and the means chosen by Congress to enforce it preserve the hope that responsible primate research holds for the treatment and cure of humankind's most terrible afflictions. The statutory design is, in turn, inconsistent with the private right of action that plaintiffs assert.

The administrative enforcement that Congress envisioned for this statute is readily apparent.[4] The Act directs the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals, but cautions that "nothing in this chapter shall be construed as authorizing the Secretary to promulgate rules, regulations, or orders with regard to design, outlines, guidelines, or performance of actual research or experimentation by a research facility as determined by such research facility." 7 U.S.C. § 2143.

The resulting standards are set forth at 9 C.F.R. §§ 3.1–3.142. The standards applicable specifically to monkeys are at 9 C.F.R. §§ 3.75–3.91. These regulations establish requirements for housing, feeding and watering, sanitation, and veterinary care.

Further directing the Secretary to "make such inspections as he deems necessary" to determine whether a research facility complies with the standards, the Act confers investigatory powers similar to those exercised by the Federal Trade Commission. 7 U.S.C. § 2146. To enforce the duties of animal care, the Secretary may issue a cease and desist order and may impose a maximum fine of $1000 for each day that each violation continues in a research laboratory, 7 U.S.C. § 2149(b). The Secretary may also remove an animal found to be suffering through the non-compliance of a laboratory—but only if the animal "is no longer required by the research facility to carry out the research, test, or experiment for which such animal has been utilized." 7 U.S.C. § 2146(a).

A review of the Act thus underscores two points. One is a commitment to administrative supervision of animal welfare. The other is the subordination of such supervision to the continued independence of research scientists. The Secretary's rule-making authority does not extend to the design of experiments; the Secretary's enforcement authority does not extend to the confiscation of animals in use. In the words of Congress, "Under this bill the research scientist still holds the key to the laboratory door." H.R.Rep. No. 91–1651, 91st Cong., 2nd Sess., reprinted in 1970 U.S. Code Cong. & Ad. News 5103, 5104. See also S. Rep. No. 1281, 89th Cong., 2nd Sess., reprinted in 1966 U.S. Code Cong. & Ad. News 2635, 2637.

The amicus curiae brief of sixty-eight scientific and medical organizations reviews the history underlying these priorities. Research with primates helped to

---

**4.** Congress first formulated the Animal Welfare Act in 1966 and has incorporated substantial amendments in 1970, 1976, and 1985, the most recent of which will become effective in December 1986. Our description refers to the details of the current Act, but our conclusions would apply as well to the pending version.

Under the revised statute, enforcement by the Secretary of Agriculture will be supplemented by the requirement that each research facility appoint an Institutional Animal Committee, including at least one veterinarian and one person not affiliated with the facility, to monitor the treatment of animals. The committee will report unconnected violations to the Department of Agriculture and to any federal agency that funds the research facility. 7 U.S.C. § 2143 (eff. December 23, 1986). This additional administrative system adopts for the Animal Welfare Act an approach that has been followed for many years by NIH. See H. Conf. Rep. No. 99–309, 99th Cong., 1st Sess., reprinted in 1985 U.S.Code Cong. & Ad.News 731, 746–48.

lead, for example, to the development of the polio vaccine, and other animal research has contributed to the discovery of insulin, the invention of transplantation techniques, and the improvement of cancer therapies. *Amici* predict that animal research will play some part in the prevention and treatment of such illnesses as multiple sclerosis, AIDS, and Alzheimer's disease. Recent amendments to the Animal Welfare Act have accordingly reaffirmed the Congressional finding that "the use of animals is instrumental in certain research and education or for advancing knowledge of cures and treatments for diseases and injuries which afflict both humans and animals." H. Conf.Rep. No. 99–447, 99th Cong., 1st Sess., *reprinted in* 1985 U.S. Code Cong. & Ad. News 1676, 2518.

Consistent with this purpose, Congress crafted a comprehensive plan for the regulation, inspection, and sanction of medical facilities that utilize animals in research. It is clear that the supervisory goals of the statute were to be realized through a regime of administrative enforcement, with a right of judicial review for an aggrieved facility. 7 U.S.C. § 2149(b). It is equally clear that these goals were not to be realized through a succession of private lawsuits. "The comprehensive character of the remedial scheme expressly fashioned by Congress strongly evidences an intent not to authorize additional remedies." *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 93–94, 101 S.Ct. 1571, 1581–84, 67 L.Ed.2d 750 (1981).

The uniformity and specialization normally thought to accompany regulatory oversight, in this case that of the Secretary, would not inhere in enforcement of the statute through private rights of action. Judges and juries possess limited acquaintance with the problems and requirements of biomedical research. Their judgments and verdicts may fail to provide that modicum of consistency and predictability without which laboratory scientists would find it difficult to operate. To add extensive pre-trial discovery of a facility's practices to the administrative inspections already authorized by Congress, 7 U.S.C. § 2146, would impose a gratuitous burden upon federally funded research. Finally, the prospect of damage awards in excess of the prescribed statutory penalties might discourage scientists from entering many lines of medical inquiry. As the Supreme Court has noted in another context, "[i]n the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981).

The Act, as our description suggests, does not imply any provision for lawsuits by private individuals as a complement to the authority of the Secretary of Agriculture. The plaintiffs therefore can draw no support from cases involving other statutes that do create standing for private individuals to challenge a particular treatment of animals. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 164 n. 15, 98 S.Ct. 2279, 2287 n. 15, 57 L.Ed.2d 117 (1978) (Endangered Species Act); *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1005–06 (D.C.Cir.1977), *cert. denied*, 434 U.S. 101, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (Marine Mammal Protection Act). "The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). Here, we are convinced that Congress intended the administrative remedy to be the exclusive remedy. To accord plaintiffs standing to sue by virtue of a private cause of action would not conform to the aims of Congress in the Animal Welfare Act.

IV.

Plaintiffs also argue that Maryland state law supports their claims for custody of the monkeys. The federal courts, however, do not have jurisdiction to consider these claims. Because the citizenship of the par-

ties is not diverse, federal authority must exist through the doctrine of pendent jurisdiction. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). According to that doctrine, state claims should usually be dismissed if the federal claims have been dismissed before trial. *Id.* at 726, 86 S.Ct. at 1139.

That rule is particularly applicable to this suit because the federal claims have been dismissed for want of standing. Without a justiciable case or controversy, federal courts cannot address claims of state law. *See* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2nd § 3531.14.*

The judgment of the district court is accordingly

AFFIRMED.