### INTERNATIONAL PRIMATE PROTECTION LEAGUE, et al., Plaintiffs–Appellees,

v.

### ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND, and National Institutes of Health, Defendants–Appellants.

No. 89–3288.

United States Court of Appeals, Fifth Circuit.

March 8, 1990.

Rehearing Denied April 13, 1990.

---

Lowell V. Sturgill, Jr., U.S. Dept. of Justice, Civ.Div., John F. Cordes, Washington, D.C., Ruth Morris Force, Asst. U.S. Atty., and John P. Volz, U.S. Atty., New Orleans, La., for Nat. Inst. of Health.

Gregory C. Weiss, Adams & Reese, New Orleans, La., for Admin. of Tulane Educational Fund.

Margaret E. Woodward, New Orleans, La., for plaintiffs-appellees.

Before GEE, REAVLEY and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

In today's case we address the issue whether a preliminary injunction which prevents the National Institutes of Health from carrying out the euthanizing of three macaque monkeys in order to conduct medical research was properly granted. Having determined that the National Institutes of Health, a federal agency, has a sufficient interest in the euthanizing of the monkeys to allow it to defend that interest in federal court, and concluding further that the plaintiffs have not alleged any injury sufficient to meet the standing requirements of Article III, we vacate the order of the district court granting the injunction and dismiss the case.

## I. FACTS

In 1981, Dr. Edward Taub, the chief of the Behavioral Biology Center of the Institute of Behavioral Research, Inc. ("IBR"),[1] had been conducting experiments at IBR's Silver Spring, Maryland, facility concerning the ability of macaque monkeys to recover use of a limb after nerves in it had been severed. The project had been funded by the National Institutes of Health ("NIH") and was undertaken in a pursuit of benefits for the rehabilitation of human patients suffering from neurological damage.

In September of 1981, Maryland police officers executed a warrant at the facility pursuant to their investigation into the alleged mistreatment of monkeys involved in the experiments. The search resulted in the seizure of 17 macaque monkeys and the arrest and conviction of Dr. Taub on multiple counts of animal cruelty under Article 27, § 59 of the Maryland Code.[2] Pursuant to a court order, NIH was given temporary charge of the monkeys.

Following Dr. Taub's conviction, People for the Ethical Treatment of Animals, Inc. ("PETA"), along with the International Primate Protection League ("IPPL"), the Animal Law Enforcement Association and several named individuals brought suit in Montgomery County, Maryland seeking, inter alia, "custody" of the monkeys seized

---

1. Prior to the present suit, IBR changed its name to the Institutes for Behavior Resources.

2. Under this section, cruelty to animals is a criminal misdemeanor which carries a maximum imprisonment of ninety days and a maximum fine of $1,000 for each offence. Dr.

Taub's convictions were later set aside because the Maryland statute was found not to apply to scientific research. *Taub v. State of Maryland,* 296 Md. 439, 463 A.2d 819 (1983). The statute has since been amended to apply to researchers. Md.Code, Art. 27, § 59 (amended 1984).

from the facility. The defendants removed to the United States District Court for the District of Maryland, which dismissed the case, finding that none of the claims of the plaintiffs alleged injury sufficient to give them standing to seek possession of the animals. The dismissal was affirmed by the Fourth Circuit. *See International Primate Protection League v. Institute for Behavioral Research, Inc.*, 799 F.2d 934 (4th Cir.1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1624, 95 L.Ed.2d 198 (1987) [hereinafter *Primate Protection* ].

Although the state court order granting temporary possession to NIH terminated in 1983, NIH has continued to act as keeper of the monkeys with the consent and cooperation of IBR, the monkeys' owners. In response to public clamor and to pressure from members of Congress, NIH transferred a number of the monkeys to Tulane's Delta Regional Primate Center. In December of 1988, NIH announced that they intended to euthanize three of these animals immediately. NIH hopes to gain, through the procedure and subsequent autopsy, knowledge that may lead to improvements in rehabilitation therapy for individuals who have suffered brain or spinal cord damage.

When NIH announced its decision, the present suit was filed in Louisiana Civil District Court asserting various state law claims and seeking possession of the monkeys. The plaintiffs in this suit are IPPL, PETA, Louisiana in Support of Animals and PETA's founder, Alex Pacheco. Named as defendants are NIH, IBR and Tulane. In December of 1989, the court issued a temporary restraining order prohibiting the euthanizing of any of the monkeys.

NIH removed the case, under the authority of 28 U.S.C. § 1442(a)(1), to the United States District Court for the Eastern District of Louisiana. The district court continued the state court's temporary restraining order, finding the equities of the case to favor the plaintiffs. As the district court extended the temporary restraining order beyond the 20 days permitted by Rule 65(b), the extended TRO became the functional equivalent of a preliminary injunction, appealable under 28 U.S.C. § 1292(a)(1). *See Fernandez–Rogue v. Smith*, 671 F.2d 426 (5th Cir.1982).

## II. DISCUSSION

NIH contends that the district court erred in extending the TRO as the plaintiffs have no likelihood of prevailing on the merits. In support of its contention, NIH relies upon three theories. First, NIH asserts that the plaintiffs lack standing to seek possession of the monkeys. Second, NIH alleges that the Supremacy Clause bars the plaintiffs' from interfering with the planned euthanization and subsequent autopsy. Third, NIH alleges that Louisiana Law contains no provision permitting private persons to bring civil suits to redress alleged "animal rights" violations. Finding the issue of standing dispositive, we do not address the other two contentions in NIH's brief.

### A. Standing

■ To meet standing requirements under Article III, the plaintiff must demonstrate two things: First "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); and second, a causal connection between the injury and the conduct such that the injury is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The Supreme Court has recognized that injuries to a plaintiff's "aesthetic, conservational, and recreational" interests are sufficient to meet the first requirement of Article III standing. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The Court has likewise noted that some interests are "too abstract, or otherwise not appropriate, to be considered judicially cognizable." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d

556 (1984). In the present case, the plaintiffs have advanced three separate claims of injury.

### 1. Personal relationships

The plaintiffs' first claim is that:

> Plaintiffs, plaintiff organizations and individual members thereof would suffer a permanent disruption of their personal relationships with the monkeys, relationships which were established prior to any previous litigation in related matters and which continued during such litigation.

This claim of injury to the plaintiffs' "personal relationships with the monkeys" is one which, within the context of this case, is insufficient to meet Article III requirements. At the outset, we recognize that the Fourth Circuit has previously rejected the virtually identical allegation by IPPL and PETA in *Primate Protection*. 799 F.2d at 938. That Court reasoned that, even if the defendants were to comply with the laws putatively violated, the plaintiffs would still lack any right to continue their personal relationships with the monkeys.

The reasoning of the Fourth Circuit in *Primate Protection*, which we adopt today, is in accord with that of the Ninth Circuit in *Animal Lovers Volunteer Ass'n v. Weinberger*, 765 F.2d 937 (9th Cir.1985), in which the plaintiff in that case sought to enjoin the killing of goats in a federal enclave. The court held that the plaintiff failed to allege sufficient injury to confer standing, finding that the Government's goat control measures "would produce no 'direct sensory impact' on [the plaintiff's] own environment or on any environment to which [its] member[s] would have access." *Id.* at 939. The court noted that if the plaintiff could show that the killing of the goats "would affect its members' aesthetic or ecological surroundings" that the plaintiff's position might have been different. *Id.* at 938.

The cases cited by the plaintiffs, in which courts have found animal rights groups to have met the Article III injury requirement, provide scant support to their claim of injury. Unlike the privately-owned laboratory animals involved in the present situation, the animals in the majority of those cases were feral ones which, were the challenged conduct of the defendants to be enjoined, the members of the plaintiff organizations could freely enjoy. For example, in *Japan Whaling Assoc. v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), the Supreme Court held that the plaintiffs in that case had "alleged a sufficient 'injury in fact' in that the whale watching and studying of their members [would] be adversely affected by continued whale harvesting." Similarly, in *Animal Welfare Institute v. Kreps*, 561 F.2d 1002 (D.C.Cir.1977), *cert. denied*, 474 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), the court held that the plaintiffs had standing because the defendants' action "impair[ed] the ability of the members of the Plaintiff organizations to see, photograph, and enjoy Cape fur seals alive in their natural habitat under conditions in which the animals are not subject to excessive harvesting, inhumane treatment and slaughter." Also, in *Alaska Fish & Wildlife Federation v. Dunkle*, 829 F.2d 933, 937 (9th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988), the court held sufficient the plaintiffs' allegation that the defendants' actions would injure "those who wish to hunt, photograph, observe, or carry out scientific studies on the migratory birds." In *American Horse Protection Association v. Frizzell*, 403 F.Supp. 1206, 1214 (D.Nev.1975), the court likewise found sufficient the allegation that "[a]mong the plaintiff's individual members are persons residing in the State of Nevada and the District of Columbia and other states who have in the past and *have the right in the future* to be users and enjoyers of the lands and wildlife which is the subject of this suit."

The plaintiffs do cite one case in which an animal rights group was held to have standing to protest the treatment of privately-owned animals. In *Humane Soc'y v. Lyng*, 633 F.Supp. 480 (W.D.N.Y.1980), a local humane society challenged a federal regulation requiring dairy farmers admitted to the Dairy Termination Program to

hot brand their cows.[3] The court held the humane society to have standing because New York State law specifically authorized it to prosecute violations of animal cruelty laws. *Id.* at 485.

The plaintiffs maintain that among their numbers are humane officers authorized under Louisiana law to remove animals being treated cruelly. *See* La.Rev.Stat.Ann. § 3:2431 (West 1987). The plaintiffs' complaint, however, makes no mention of this fact, does not assert a cause of action under § 3:2431, and fails to allege that any of statutory prerequisites to animal removal have been met.[4] *See Id.* at §§ 3:2432–38.

### 2. Long standing, sincere commitment

The plaintiffs' second claim of injury is that:

> Plaintiffs, plaintiff organizations and individual members thereof maintain a long-standing, sincere commitment to preventing inhumane treatment of animals, especially as concerns the monkeys now at Delta, and their aesthetic, conservational and environmental interests would be particularly, severely, and detrimentally affected.

The plaintiffs' "long-standing, sincere commitment" is likewise insufficient to support standing under Article III. In *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Supreme Court rejected the Sierra Club's contention that its organizational commitment to conservation was sufficient to meet the injury requirement, stating:

> The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation,

there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

*Id.* at 739, 92 S.Ct. at 1368. Similarly, the plaintiffs' sincere commitment to the humane treatment of animals in the present case is insufficient to distinguish them from other members of the public.

The plaintiffs' claim of harm to their "aesthetic, conservational and environmental interests" fails for the same reason that their "personal relationship" claim fails. The plaintiffs neither allege facts which demonstrate that they have any aesthetic, conservational or environmental interests in the laboratory monkeys, nor allege facts which would demonstrate that the destruction of the laboratory monkeys would impair the plaintiffs' interests in monkeys living in the wild. Were the plaintiffs to allege, for example, that the species of monkey here involved was endangered and that the destruction of the laboratory monkeys would therefore impair conservation efforts to preserve or restore such an endangered species to its wild habitat, their claims of injury might be more cognizable. As they have not (and likely could not credibly) make such an allegation, the plaintiffs second claim of injury is insufficient to confer standing.

### 3. Advocates for the monkeys

The plaintiffs' third claim of injury is that:

> Plaintiffs' mission as advocates for the rights of the Silver Spring Monkeys, who

**3.** *See* U.S. Department of Agriculture Notice LD–248; *see also* H.R.Rep. No. 99–271(I), 99th Cong., 1st Sess. 20–21, *reprinted in* 1985 U.S. Code Cong. and Admin.News 1103, 1124–25; 7 U.S.C. § 1446(d)(3).

**4.** We note that even if these hurdles were overcome, a finding that the euthanasia of the monkeys would constitute cruelty under § 3:2431 is unlikely. In their attempt to characterize the

defendants' planned action as cruelty, the plaintiffs rely on § 14:102.1, defining criminal cruelty to animals. Although this section does hold guilty one who "[t]ortures, torments, cruelly beats or unjustifiably injures, maims, mutilates, or kills any living animal," the section contains an express exemption for scientific and medical research.

have no means of protecting themselves, would be severely impaired.

As discussed above, the Supreme Court in *Sierra Club* has ruled this kind of "special interest" insufficient to confer standing. Implicit in the plaintiffs' third claimed injury, however, is the contention that the plaintiffs should be allowed standing because to deny it would leave the monkeys unprotected. The Supreme Court rejected a similar contention in *Valley Forge Christian College v. Americans United for Separation of Church and State:*

> "The assumption that if respondents have no standing to sue, 'no one would have standing, is not a reason to find standing.' This view would convert standing into a requirement that must be observed only when satisfied. Moreover, we are unwilling to assume that injured parties are nonexistent simply because they have not joined respondents in their suit. The law of averages is not a substitute for standing."

454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982) (citation omitted). Accordingly, the mere fact that the monkeys would be left without an advocate in court does not create standing where it otherwise does not exist.

## B. Removal

■ The plaintiffs contend that even if they lack standing under Article III, they meet the requirements for standing under state law; as they allege only state law causes of action, the plaintiffs maintain, the more stringent Article III requirements need not be met. Although standing requirements in state courts are often less stringent than those of Article III, the issue lacks relevance here, as standing in federal court is determined entirely by Article III and depends in no degree on whether standing exists under state law. *Phillips Petroleum Co. v. Shotts,* 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985). This rule applies as well to cases which arrive in federal court by means of removal. *See Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 687 (8th Cir.1979).

■ The plaintiffs urge that, if they cannot properly maintain suit in federal court, the case should be remanded to Louisiana state court. The present case was removed by NIH under the authority of 28 U.S.C. § 1442(a)(1), which permits removal by "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." Unlike removal under § 1441, where the discovery of a jurisdictional defect would require remand to state court, a federal defendant's right of removal under § 1442(a)(1) is absolute. *Arizona v. Manypenny,* 451 U.S. 232, 242, 101 S.Ct. 1657, 1664, 68 L.Ed.2d 58 (1981). If a case has been removed pursuant to § 1442(a)(1), a plaintiff's lack of Article III standing requires dismissal of his claims against the federal defendant, regardless of the plaintiff's previous standing in state court. *Maine Ass'n of Interdependent Neighborhoods, Inc. v. Petit,* 644 F.Supp. 81, 84–85; *see also Maine Ass'n of Interdependent Neighborhoods, Inc. v. Commissioner, Maine Dept. of Human Services,* 876 F.2d 1051, 1055 (1st Cir.1989).

The plaintiffs contend, however, that removal of the action by NIH under § 1442(a)(1) was improper. The plaintiffs urge two theories in support of their contention: First, that as NIH is a federal agency, and not a federal officer, § 1442(a)(1) is inapplicable; second, that NIH has no legally cognizable interest in the monkeys sufficient to support removal under § 1442(a)(1).

### 1. Federal agencies

■ Although the plaintiffs concede that we have previously stated that § 1442(a)(1) applies to federal agencies, they contend that such statements were merely dicta. In *Smith v. City of Picayune,* 795 F.2d 482 (5th Cir.1986), we held that a federal district court did not abuse its discretion by entertaining a plaintiff's state law claims because the Farmers Home Administration, a federal agency, was a defendant in the case and could have removed the case to federal court under § 1442(a)(1) had it been filed in state court. *Id.* at 485. In so

holding, we noted a split of authority on the issue of whether 1442(a)(1) applies to federal agencies [5] and accepted the view that it did. As we expressly found state issues predominant in that litigation, our determination that the agency could have removed under § 1442 was crucial to our holding that the district court had jurisdiction to hear the case. *Id.*[6] The plaintiffs' attempt to characterize our holding in that case as nonauthoritative is weak at best.

### 2. NIH's interest in the monkeys

 The plaintiffs maintain that although they named NIH as a defendant in this action, NIH has had no interest in the monkeys following the expiration of the court order giving it temporary "custody"; if NIH has no interest, the plaintiffs contend, then removal under § 1442 was improper.

The plaintiffs fail to recognize that "the only prerequisite to removal of a civil action under § 1442 is that it be *brought against* a federal officer or agency." *IMFC Professional Servs. v. Latin Am. Home Health, Inc.*, 676 F.2d 152 (5th Cir. Unit B 1982). As NIH is named as a defendant in the present action, the case was properly removed.

Although we find the case to have been properly removed, we recognize that if NIH indeed has no interest whatsoever in the monkeys, the dismissal of NIH from the suit would require remand, rather than dismissal, of the plaintiffs' suit against Tulane and IBR. *Cf. IMFC*, 676 F.2d at 158–59; *Williams v. City of Atlanta*, 794 F.2d 624, (11th Cir.1986). The issue here then is whether NIH's possessory, financial and research interests in the monkeys are sufficient to allow it the right to protect those interests in federal court.

In enacting 28 U.S.C. § 1442, Congress recognized that

> federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials.

*Murray v. Murray*, 621 F.2d 103, 106 (5th Cir.1980). In *Murray*, the United States was named as a Garnishee in a state court lawsuit by a woman against her ex-husband seeking her husband's Veterans' Administration benefits in satisfaction of unpaid alimony. The government removed under § 1442(a)(1) to federal district court, which denied Mrs. Murray relief on summary judgment. We reversed the judgment of the district court for want of jurisdiction, reasoning that the United States was a "mere stakeholder" in the action. We held that because the government was unable to identify how the disposition of the garnishment action in state court could "arrest, restrict, impair, or interfere with the actions of a federal official or the operations of the federal government," the action fell beyond the scope of protection afforded by § 1442(a)(1). *Id.* at 107.

In the present case, NIH has demonstrated that its interest goes beyond that of "mere stakeholder." NIH funded IBR's original experimentation on the monkeys and, with the owner's consent, serves as the monkeys' keeper. More important, however, is that the planned euthanasia on the monkeys and accompanying research is in furtherance of NIH's statutory mission to conduct and fund biomedical research. Because the injunctive relief sought by the plaintiffs could interfere with NIH's operations, it is entitled to protect its legitimate interests in a federal forum. As federal court jurisdiction is limited by the constitution, the plaintiffs' failure to allege injury sufficient to satisfy Article III standing requirements is fatal to their suit. Accordingly, we VACATE the order of the district court granting the preliminary injunction and DISMISS the case.

---

**5.** *See* 14A Wright, Miller & Cooper, Federal Practice & Procedure § 3727 (2d ed. 1985).

**6.** *See also IMFC Professional Servs. v. Latin Am. Home Health, Inc.*, 676 F.2d 152, 155–56 (5th Cir. Unit B 1982).