932 F.2d 920
 18 U.S.P.Q.2d 1677
 ANIMAL LEGAL DEFENSE FUND, the American Society for the
Prevention of Cruelty to Animals, the Marin Humane Society,
Wisconsin Family Farm Defense Fund, John Kinsman, Michael
Cannell, Humane Farming Association, Association of
Veterinarians for Animal Rights, People for the Ethical
Treatment of Animals, Plaintiffs-Appellants,
v.
Donald J. QUIGG and C. William Verity, Defendants-Appellees.
 No. 90-1364.
 United States Court of Appeals,
Federal Circuit.
 April 30, 1991.
 
 Valerie Stanley, Galvin, Stanley & Hazard, Washington, D.C., argued for plaintiffs-appellants. Steven M. Wise, Fraser & Wise, P.C., Boston, Mass., argued for plaintiffs-appellants. Joyce S.A. Tischler, Animal Legal Defense Fund, San Rafael, Cal., was on the brief for plaintiffs-appellants. Kenneth D. Ross, Ross & Harrington, Chicago, Ill., of counsel.
 John F. Daly, Dept. of Justice, Washington, D.C., argued for defendants-appellees. Stuart M. Gerson, Asst. Atty. Gen., William T. McGivern, U.S. Atty., Barbara L. Herwig, Dept. of Justice, Washington, D.C., were on the brief for defendants-appellees. Also on the brief was Fred E. McKelvey, Sol., U.S. Patent & Trademark Office, Arlington, Va., of counsel.
 Before NIES, Chief Judge, and MARKEY, ARCHER, MAYER and LOURIE, Circuit Judges.[1]
 NIES, Chief Judge.
 
 
 1
 This is an appeal from the order of the District Court for the Northern District of California (Smith, J.) granting defendants' motion to dismiss the complaint in Animal Legal Defense Fund v. Quigg, 710 F.Supp. 728, 9 USPQ2d 1816 (N.D.Cal.1989), for failure to state a claim under the Administrative Procedure Act, Pub.L. No. 89-554, 80 Stat. 383 (1966) (APA). Various plaintiffs, individual farmers and groups of animal husbanders or nonprofit organizations whose goal is the protection of animals, filed suit in district court under the APA challenging, on procedural and substantive grounds, a Notice issued by the Department of Commerce Patent and Trademark Office (PTO) which stated, inter alia, that the PTO "now considers non-naturally occurring, non-human multicellular organisms, including animals, to be patentable subject matter within the scope of 35 U.S.C. Sec. 101 [the patent statute]." Plaintiffs seek to impede, indeed, stop issuance of patents for animals. The defendants, Donald Quigg, then Commissioner of Patent & Trademarks, and C. William Verity, then Secretary of Commerce, countered with a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The district court granted defendants' motion on the grounds that the challenged Notice fell within an exception to the public notice and comment requirements of the APA and that the Commissioner did not exceed his statutory authority in issuing the Notice. The court further held that whether any "animal" patents which might be issued by the PTO would exceed its authority under section 101 was not raised by the suit. We affirm but on the alternative ground that the plaintiffs lack standing. Because of the nature of the injury alleged by some of the parties, however, our ruling on standing subsumes the ground relied on by the district court.
 
 
 2
 * Section 101 of Title 35, United States Code, provides the statutory definition of the subject matter upon which a patent may be granted:
 
 Sec. 101 Inventions patentable
 
 3
 Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
 
 
 4
 35 U.S.C. Sec. 101 (1988). In 1980, the Supreme Court decided Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), wherein the Court held that non-naturally occurring man-made living microorganisms fall within the definition of patentable subject matter in section 101. Following that decision, the PTO's Board of Patent Appeals and Interferences applied the Chakrabarty decision to conclude that non-naturally occurring man-made multicellular plants were patentable under section 101 in Ex Parte Hibberd, 227 USPQ 443 (Bd.Pat.App. & Int.1985). Also following that decision, the Board applied Chakrabarty to hold that section 101 was not a bar to patentability for a specific non-naturally occurring genetically altered strain of polyploid oysters in Ex Parte Allen, 2 USPQ2d 1425 (Bd.Pat.App. & Int.1987), aff'd, 846 F.2d 77 (Fed.Cir.1988) (Table). On April 7, 1987, within days of the Board's decision in Allen, the PTO issued the following notice:
 
 
 5
 A decision by the Board of Patent Appeals and Interferences in Ex parte Allen, [2 USPQ2d 1425] (Bd.App. & Int. April 3, 1987), held that claimed polyploid oysters are nonnaturally occurring manufactures or compositions of matter within the meaning of 35 U.S.C. 101. The Board relied upon the opinion of the Supreme Court in Diamond v. Chakrabarty, 447 U.S. 303 [100 S.Ct. 2204, 65 L.Ed.2d 144], 206 USPQ 193 (1980) as it had done in Ex parte Hibberd, 227 USPQ 443 (Bd.App. & Int., 1985), as controlling authority that Congress intended statutory subject matter to "include anything under the sun that is made by man." The Patent and Trademark Office now considers nonnaturally occurring non-human multicellular living organisms, including animals, to be patentable subject matter within the scope of 35 U.S.C. 101.
 
 
 6
 The Board's decision does not affect the principle and practice that products found in nature will not be considered to be patentable subject matter under 35 U.S.C. 101 and/or 102. An article of manufacture or composition of matter occurring in nature will not be considered patentable unless given a new form, quality, properties or combination not present in the original article existing in nature in accordance with existing law. [Citations omitted].
 
 
 7
 A claim directed to or including within its scope a human being will not be considered to be patentable subject matter under 35 U.S.C. 101. The grant of a limited, but exclusive property right in a human being is prohibited by the Constitution. Accordingly, it is suggested that any claim directed to a non-plant multicellular organism which would include a human being within its scope include the limitation "non-human" to avoid this ground of rejection. The use of a negative limitation to define the metes and bounds of the claimed subject matter is a permissible form of expression. In re Wakefield, 422 F.2d 897 [57 CCPA 959], 164 USPQ 636 (1970).
 
 
 8
 Accordingly, the Patent and Trademark Office is now examining claims directed to multicellular living organisms, including animals. To the extent that the claimed subject matter is directed to a non-human "nonnaturally occurring manufacture or composition of matter--a product of human ingenuity" (Diamond v. Chakrabarty ), such claims will not be rejected under 35 U.S.C. 101 as being directed to nonstatutory subject matter. [Hereinafter "Notice" or "Rule".][2]
 
 
 9
 1077 Official Gazette 24 (April 21, 1987).
 
 
 10
 More than a year after this Notice was published, the various plaintiffs[3] filed suit in district court alleging in Count I that the Commissioner of Patents and Trademarks had violated the APA in issuing this Rule without complying with the public notice and comment period of the APA, 5 U.S.C. Sec. 553 (1988). Plaintiffs sought to enjoin the PTO from approving or issuing any patents on multicellular living organisms, including animals,[4] or taking any action to effectuate the Rule, until it complied with the APA procedural requirements. In Count II plaintiffs alleged that the Commissioner violated section 706(2)(C) of the APA, 5 U.S.C. Sec. 706(2)(C) (1988), by acting in excess of statutory authority under the Patent Act, 35 U.S.C. Sec. 1, et seq. As relief under Count II, plaintiffs sought a declaration that the Commissioner acted in excess of his statutory jurisdiction or authority by including animals as patentable subject matter and an injunction against his issuance of any patents on multicellular living organisms, including animals, until authorized and mandated to do so by Congress. Defendants filed a motion to dismiss the complaint for failure to state a claim, and this motion was granted by the district court.
 
 
 11
 The district court expressly assumed without deciding that the various plaintiffs had standing and based the order of dismissal of Count I solely on its conclusion that the Rule fell outside the public notice and comment provisions of the APA, 5 U.S.C. Sec. 553(b), (c) (1988). Animal Legal Defense Fund, 710 F.Supp. at 729, 732, 9 USPQ2d at 1816, 1819. Per the district court, the Rule was "interpretative" of prior decisional precedent and thus was expressly exempt from notice and comment under section 553(b)(A). The court held further that because the Rule itself, which did no more than interpret decisional law, neither abridged nor enlarged the rights of anyone, it was clearly within the Commissioner's authority to promulgate. Finally, the court concluded that the question whether the precedent was correct and whether any "animal" patents actually issued were invalid was not raised by the subject action. Id. at 732, 9 USPQ2d at 1819.
 
 
 12
 The various plaintiffs then appealed that order of dismissal to the United States Court of Appeals for the Ninth Circuit. While recognizing that the APA created the causes of action, that court issued an order transferring the appeal to the Court of Appeals for the Federal Circuit. See Animal Legal Defense Fund v. Quigg, 900 F.2d 195 (9th Cir.1990). We exercise jurisdiction over the appeal pursuant to 28 U.S.C. Sec. 1295(a)(1) (1988).[5]
 
 
 13
 Appellants not only seek to overturn the district court's rulings of no procedural error or abuse of authority but also urge us to hold that "animal" patents are not patentable subject matter under section 101. The government urges affirmance of the court's rulings and also urges affirmance of the judgment on the alternative ground raised below, namely, that appellants lack standing.[6] The issue of standing on which we rule against appellants is, of course, dispositive of all other issues.
 
 II
 Standing
 
 14
 Under Article III Sec. 2 of the Constitution, the judicial power of courts created under Article III extends only to actual "cases" or "controversies". One aspect of a "case" or "controversy" is that "the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). "Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue." Sierra Club v. Morton, 405 U.S. 727, 731-32, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972).
 
 
 15
 To establish standing to sue, as Article III Sec. 2 has been interpreted, a party must, "at an irreducible minimum," show (1) "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct" (personal injury), (2) that "the injury 'fairly can be traced to the challenged action' " (causation), and (3) that the injury "is likely to be redressed by a favorable decision" (effective relief). Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) [citation omitted]. In addition to these requirements for standing, the Supreme Court has further limited standing to those parties within the "zone of interests" a particular statute addresses. Air Courier Conference of America v. American Postal Workers Union, --- U.S. ----, ----, 111 S.Ct. 913, 917, 112 L.Ed.2d 1125 (1991) and cases cited therein, including Association of Data Proc. Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). A party must satisfy all of the above criteria to establish standing. Appellants assert that they have standing as persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" and are "entitled to judicial review" under 5 U.S.C. Sec. 702 (1988). Thus, the appellants must meet the standing requirements in the context of this section of the APA.
 
 
 16
 As a preliminary matter, we note, as appellants point out, that this case comes before us as a result of the district court's having granted a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206. In their complaint, the various appellants, alternatively or collectively, allege numerous different bases which they argue are sufficient allegations to satisfy standing requirements. While here and there an appellant presents a viable argument on one or more of the standing factors identified above, we conclude that none of these parties has made allegations sufficient to satisfy standing criteria with respect to either count of the complaint.
 
 III
 Count I
 A.
 
 17
 Count I of the complaint alleges that the putative illegal conduct lies in the Commissioner's failure to publish a notice of his proposed action in the Federal Register as required by 5 U.S.C. Sec. 553(b); his failure to allow interested persons an opportunity to submit data and arguments per section 553(c); and his failure to state the basis and purpose of the Notice following consideration of public comment.
 
 
 18
 Every organizational plaintiff in this case alleges that it was injured as a result of its having been denied participation in the PTO's rulemaking process. See, e.g., Trustees for Alaska v. Hodel, 806 F.2d 1378, 1380 (9th Cir.1986) (standing exists based on alleged injury to procedural rights under the National Environmental Policy Act where public comment provision in 40 C.F.R. Sec. 1506.8(b)(2)(ii) not properly followed). The allegations of ALDF typify the nature of this alleged "procedural harm":
 
 
 19
 Plaintiff, ANIMAL LEGAL DEFENSE FUND, (hereinafter "ALDF") is a national nonprofit corporation, organized and existing under California law, with its principal place of business in San Rafael, California. ALDF's purposes and activities include: the initiation of and participation in federal and state legal actions and administrative rulemaking proceedings, the provision of information and legal opinions to its members, the general public and governmental agencies, and the advocacy of the interests of its members in connection with: the furtherance of the care and welfare of animals, including farm, research and wild animals, and any rule, policy, act, omission, or neglect which causes or permits physical pain, behavioral distress, suffering, debilitation and/or death to animals. ALDF works to ensure that important governmental decisions affecting the lives and interests of animals are based on a rational analysis and made according to the law.
 
 
 20
 Since its inception in 1979, ALDF has participated in numerous administrative rulemaking proceedings. It has an interest in participating in any rulemaking proceeding regarding the patenting of animals, in providing information and documentation to Defendants, in providing its members and the public with information about any proposed rule to patent animals, and in advocating the interests of its members.
 
 
 21
 ALDF's purposes and activities have been and will continue to be frustrated and adversely affected by Defendants' new rule and its refusal to provide the public with notice and an opportunity to comment prior to the adoption of its new rule. ALDF has had to and will continue to have to devote significant financial resources to counteract the Defendants' unlawful actions. Plaintiff, ALDF, sues on behalf of itself and its members who are injured in their ability to carry out the purposes and activities of the organization due to Defendants' actions.
 
 Those of PETA offer little variation:
 
 22
 Plaintiff, People for the Ethical Treatment of Animals (hereinafter "PETA") is a national nonprofit corporation with over 250,000 members and supporters. The purposes and activities of PETA include: to protect and enhance the status of animals, and to educate the general public about the issues of animal rights and systematized animal abuse, to participate in federal and state legislative and administrative rulemaking proceedings, to provide information to its members and the general public and to influence governmental decision-making on behalf of its members. PETA has an interest in providing information to Defendants which may have an impact on Defendants' formulation of any rule regarding the patenting of animals. PETA has an interest in ascertaining the underlying rationale for Defendants' new rule before it becomes finalized and providing its members and the public with such information, along with information about the consequences of such a rule, in order that PETA and its members may participate meaningfully in the decision making process. PETA's purposes, activities and interests have been and will continue to be frustrated and adversely affected by Defendants' refusal to provide the public with notice and the opportunity to comment prior to adopting the new rule. PETA will have to devote significant financial resources to counteract Defendants' unlawful actions.
 
 
 23
 Similar allegations are echoed by ASPCA, MHS, WFFDF, HFA and AVAR.
 
 
 24
 Whether there is any viability in such allegation of injury by reason of the alleged procedural defect,[7] namely, the Commissioner's failure to provide public notice and comment procedures in adopting the rule, depends on the resolution of an issue of law: Was the Commissioner required to comply with section 553 before issuing the Rule? For reasons which follow, we conclude he was not. Thus, appellants' allegations of injury also fail as a matter of law.
 
 B.
 
 25
 Under section 553 of the APA, certain agency action requires prior public notice and comment. As provided therein:
 
 
 26
 (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law....
 
 
 27
 * * * * * *
 
 
 28
 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments....
 
 
 29
 5 U.S.C. Sec. 553(b), (c). Notice and public comment, however, is not required for agency action if it falls within the terms of subsection (A) of section 553(b):
 
 
 30
 Except when notice or hearing is required by statute, this subsection does not apply--
 
 
 31
 (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice....
 
 
 32
 Courts interpreting section 553 generally speak in terms of "substantive" or "legislative" rules requiring notice and comment in contrast to the exempt "interpretative" rules of section 553(b) which do not. See, e.g., Seldovia Native Ass'n, Inc. v. Lujan, 904 F.2d 1335, 1346-47 (9th Cir.1990); American Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987); W.C. v. Bowen, 807 F.2d 1502, 1504 (9th Cir.1987); Alaniz v. Office of Personnel Management, 728 F.2d 1460, 1467 (Fed.Cir.1984); Gosman v. United States, 573 F.2d 31, 39, 215 Ct.Cl. 617 (1978). A rule is "substantive" when it "effects a change in existing law or policy" which "affect[s] individual rights and obligations." Cubanski v. Heckler, 781 F.2d 1421, 1426 (9th Cir.1986) vacated as moot, sub nom. Bowen v. Kizer, 485 U.S. 386, 108 S.Ct. 1200, 99 L.Ed.2d 402 (1988); see also Chrysler Corp. v. Brown, 441 U.S. 281, 302, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979) ("affecting individuals' existing rights and obligations"); Gosman, 573 F.2d at 39 (change existing law or policy). To be "substantive", a rule must also be promulgated pursuant " 'to statutory authority ... and implement the statute.' " Cubanski v. Heckler, 781 F.2d at 1426 [citation omitted]; see also Chrysler Corp., 441 U.S. at 302-03, 99 S.Ct. at 1717-18. In contrast, a rule which merely clarifies or explains existing law or regulations is "interpretative." See American Hosp. Ass'n, 834 F.2d at 1045; Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir.1983); Gosman, 573 F.2d at 39.
 
 
 33
 The genesis and effect of the Notice demonstrates that it represents no change in the law effected by the Commissioner and that, in reality, it is merely "interpretative" of prior decisional precedent. As acknowledged by appellants, in 1981 the Supreme Court decided, in Diamond v. Chakrabarty, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), that live, non-naturally occurring microorganisms fell within the patentable subject matter covered by section 101. Following the Supreme Court's ruling on the scope of section 101, the Board of Patent Appeals decided Ex Parte Hibberd, 227 USPQ 443 (1985), wherein the Board, relying on the Supreme Court's decision in Chakrabarty, held that non-naturally occurring, multicellular living plants were patentable subject matter under section 101. Thereafter, the Board decided Ex Parte Allen, 2 USPQ2d 1425 (1987), where it reversed an examiner's rejection that claims drawn to a particular non-naturally occurring polyploid oyster were directed to nonpatentable subject matter, although ultimately upholding the examiner's rejection that the oysters would have been obvious in view of prior art under section 103. In this decision, the Board stated that "the Supreme Court made it clear in its decision in Diamond v. Chakrabarty, ... that Section 101 includes man-made life forms. The issue, in our view, in determining whether the claimed subject matter is patentable under Section 101 is simply whether that subject matter is made by man." Id. at 1426. This court affirmed that decision on appeal, although the panel did not expressly endorse or even mention the section 101 issue. In re Allen, 846 F.2d 77 (Fed.Cir.1988) (Table).[8]
 
 
 34
 Four days after the Board's decision in Allen, the Commissioner issued the Notice in issue here. The language used by the Commissioner in the Notice largely tracks the above history and the language of Allen. In the first paragraph, the Commissioner summarizes the foregoing decisional law of Allen, Hibberd, and Chakrabarty and, based on the conclusions of the Supreme Court and the Board as to the scope of section 101, states that the PTO "now considers nonnaturally occurring non-human multicellular living organisms, including animals, to be patentable subject matter within the scope of 35 U.S.C. 101." 1077 Official Gazette 24 (emphasis added). In the next paragraph, the Commissioner reiterates, as the Board recognized in Allen, 2 USPQ2d at 1426-27, that the scope of the "Board's decision does not affect the principle that products found in nature will not be considered to be patentable subject matter...." Finally, in the last paragraph, the Commissioner quotes language from the Supreme Court decision in Chakrabarty that a claim to a "nonnaturally occurring manufacture or composition of matter--a product of human ingenuity" will not be subject to a section 101 rejection. Id. The Notice clearly corresponds with the interpretations of section 101 set out by the Board in Allen and Hibberd, in reliance on Chakrabarty, with the only caveat being the statement that section 101 does not extend to humans.[9] Thus, the Notice falls within the class of agency action which is merely interpretative of previous valid administrative action, and, as a result, represents no "change" in the law by the Commissioner. See Northern Illinois Gas Co. v. United States, 833 F.2d 1582, 1583 (Fed.Cir.1987); Gibson Wine Co., Inc. v. Snyder, 194 F.2d 329 (D.C.Cir.1952) (interpretation that "boysenberry" was not "blackberry" under labeling regulation held not subject to notice and comment).
 
 
 35
 Appellants argue, nonetheless, that the Notice is "substantive" because it reverses a longstanding PTO policy whereby non-naturally occurring microorganisms were considered to fit within the definition of patentable subject matter, but the PTO "had long considered animals not to be patentable subjects." This argument at best merely ignores the Board's intervening interpretation of section 101 made in its Allen and Hibberd decisions and at worst treats the Board as the alter ego or agent of the Commissioner which it is not. If this were the case, the Board's decision in Allen would effectively be a decision by the Commissioner, and the Commissioner could not properly consider the Notice as "interpretative" of that decision. In essence, the appellants seek to tie the Board's authority to adjudicate patentability issues to the statutory grant of rule making authority given to the Commissioner. However, the Board's authority to decide the section 101 issue rests on an independent grant in section 7(b), which requires the Board to decide patent validity issues when properly raised in Board proceedings, and is independent from the Commissioner's authority to establish regulations. Specifically, this section reads:
 
 
 36
 (b) The Board of Patent Appeals and Interferences shall, on written appeal of an applicant, review adverse decisions of examiners upon applications for patents and shall determine priority and patentability of invention in interferences declared under section 135(a) of this title.
 
 
 37
 35 U.S.C. Sec. 7(b).[10] Subsuming this authority within that of the Commissioner would impermissibly make the Board unable to decide legal questions of first impression through adjudication whenever the Commissioner would be required to follow section 553 notice and comment requirements. Cf. National Labor Relations Bd. v. Bell Aerospace Co., 416 U.S. 267, 292-95, 94 S.Ct. 1757, 1770-72, 40 L.Ed.2d 134 (1974) (Adjudicated cases may serve as vehicles for the formulation of agency policies which may initially be applied and announced therein. Such cases generally provide a guide to action that the agency may be expected to take in future cases as well.); National labor Relations Bd. v. Wyman-Gordon Co., 394 U.S. 759, 765-66, 89 S.Ct. 1426, 1429-30, 22 L.Ed.2d 709 (1969) (plurality opinion) (same). Thus, the legal authority supporting the Board's decision, the premise for the Commissioner's interpretation, does not rest on the Commissioner's own authority. Cf. Boating Indus. Ass'n v. Marshall, 601 F.2d 1376, 1382 (9th Cir.1979) (Boating Association had no standing to challenge employee benefits ruling by Secretary of Labor where, inter alia, statutory process for claim determination under Longshoremen's and Harbor Workers' Compensation Act includes appeal through Benefits Review Board and review in a court of appeals and neither the Office of Workers' Compensation Programs nor the Secretary of Labor can determine the outcome of this process.)
 
 
 38
 Appellants further argue that the Notice is "substantive" because it cuts off agency discretion to deny applications for "animal" patents during prosecution. Appellants contend that under W.C. v. Bowen, 807 F.2d at 1505, "[r]ules which substantially limit an agency's discretion are generally substantive rules." Per appellants, the Notice is "binding on agency personnel" and takes away the "discretion" of PTO examiners to enter a rejection based on section 101 of claims directed to non-naturally occurring multicellular animals.
 
 
 39
 Appellants read Bowen too broadly. A limitation of discretion, by itself, does not make an agency action "substantive." One must also look for the adverse effect of that limitation on an individual's rights and obligations. In Bowen, the court found that the limitation on the Secretary's discretion, resulting from a program under which certain Administrative Law Judge decisions had to be reviewed, adversely affected some claimants' asserted rights to Social Security disability benefits. In the context of the case before us, the comparable question would be whether any limitation on an examiner's discretion to disallow applications on section 101 grounds adversely affects any individual's existing rights and obligations.
 
 
 40
 Here appellants assert no adverse effect on any individual's rights to benefits under the patent statute. Rather, they assert that the general public has an interest in the statutory limitations to patentability. Essentially, appellants assert a right, as members of the public particularly interested in animals, to sue for what they perceive to be an unwarranted interference with the discretionary judgment of an examiner. However, it must be noted that whether patents are allowable for animal life forms is not a matter of discretion but of law. See Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966) ("ultimate question of patent validity is one of law"). Thus, if we assume examiners must follow the Notice--which the Commissioner denies--such action has no effect on the ultimate validity of any patent. Either the subject matter falls within section 101 or it does not, and that question does not turn on any discretion residing in examiners.[11]
 
 
 41
 Moreover, we find nothing in the law which gives rise to a right in nonapplicants to object to the way in which patent applications of others are prosecuted. A third party has no right to intervene in the prosecution of a particular patent application to prevent issuance of an allegedly invalid patent. See, e.g., Chicago Rawhide Mfg. Co. v. Crane Packing Co., 523 F.2d 452, 458 n. 13, 187 USPQ 540, 545-46 n. 13 (7th Cir.1975), cert. denied, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103, 188 USPQ 480 (1976); Williams Mfg. Co. v. United Shoe Mach. Corp., 121 F.2d 273, 277, 50 USPQ 264, 269 (6th Cir.1941), aff'd, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942); Godtfredson v. Banner, 503 F.Supp. 642, 646, 207 USPQ 202, 207 (D.D.C.1980); see also Syntex v. United States Patent and Trademark Office, 882 F.2d 1570, 1574-75, 11 USPQ2d 1866, 1870 (Fed.Cir.1989) ("The creation of a right or remedy in a third party to challenge a result favorable to a patent owner after ex parte prosecution would be unprecedented, and we conclude that such a right cannot be inferred."). Appellants are in effect attempting to intervene as third parties in the prosecution of all animal patent applications. By analogy, merely because appellants make a broadside attack gives no greater right of intervention against all than against one.
 
 
 42
 Nor does the Notice adversely "affect existing rights and obligations" of patent applicants. The requirement of an adverse affect on a party's rights or obligations stems from the APA itself. See, e.g., 5 U.S.C. Secs. 552(a), 702 ("adversely affected" party). The effect of the Notice, if mandatory, means that the examiner will refrain from issuing a section 101 rejection, but patent applicants are not "adversely affected" by an examiner's failure to enter a rejection. If there is no rejection, the patent simply issues, and the ultimate resolution of the invalidity of the claims is deferred until challenged in court. Deferring resolution of validity issues does not adversely affect the legal rights of the applicant.
 
 
 43
 Appellants also argue that when the source of the agency authority is a statutory grant of general rulemaking authority made by Congress, rules enacted pursuant to that grant have "legislative" or "substantive" effect, because they carry the force and effect of law, and therefore are "substantive" for purposes of section 553. Applying this principle to the Notice, appellants contend first that the Notice had to have been issued pursuant to the grant of authority to the Commissioner to "establish regulations" set forth in 35 U.S.C. Sec. 6.
 
 
 44
 Addressing the latter point, nothing in the Notice suggests that the Commissioner invoked his section 6 authority in issuing the Notice. Moreover, the authority granted in section 6 is directed to the "conduct of proceedings" before the Office. A substantive declaration with regard to the Commissioner's interpretation of the patent statutes, whether it be section 101, 102, 103, 112 or other section, does not fall within the usual interpretation of such statutory language. See, e.g., General Elec. Co., Inc. v. Gilbert, 429 U.S. 125, 141 & n. 20, 97 S.Ct. 401, 410 & n. 20, 50 L.Ed.2d 343 (1976) (EEOC guideline interpreting Title VII of the Civil Rights Act not within the statutory authority to "issue ... suitable procedural regulations to carry out the provisions of the subchapter," 42 U.S.C. Sec. 2000e-12(a)). That is not to say that the Commissioner does not have authority to issue such a Notice but, if not issued under the statutory grant, the Notice cannot possibly have the force and effect of law. Chrysler Corp., 441 U.S. at 302, 99 S.Ct. at 1717 (rule must be promulgated pursuant to statutory authority to have force and effect of law); Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) (same); General Elec., 429 U.S. at 141-42, 97 S.Ct. at 410-11 (need not have statutory authority to issue guidelines); H. Walmsley, The Rulemaking Power of the Commissioner of Patent and Trademarks (Part 2), 64 J. Pat. Off. Soc'y 539, 541 (1982) (notices published in PTO's weekly Official Gazette not considered to have force and effect of law).
 
 
 45
 Further, if the Notice were issued under section 6, that fact does not mean that the Notice is ipso facto "substantive." If appellants' argument were correct, every action taken by an agency pursuant to statutory authority would be subject to public notice and comment under section 553. Such a result would vitiate the statutory exceptions in section 553(b) itself, here the exception for "interpretative" rules. We cannot so interpret section 553. See Mountain States Telephone & Telegraph Co. v. Santa Ana, 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985); Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979) ("[one] elementary canon of construction [is] that a statute should be interpreted so as not to render one part inoperative."); Horner v. Merit Sys. Protection Bd., 815 F.2d 668, 674 (Fed.Cir.1987). Thus, were the source of authority for the agency action a statutory grant, that would not compel us to conclude the notice is "substantive."
 
 
 46
 Having reviewed all of appellants' arguments, we are persuaded that the Commissioner's Notice falls within the "interpretative" exception to the section 553 public notice and comment procedures. Appellants thus have no standing to assert Count I of the Complaint by reason of "procedural harm."
 
 
 47
 Appellants allege other injuries, which we discuss in connection with Count II and hold to be insufficient for standing under that Count. If we were to assume these alleged injuries also relate to Count I, it would be a meaningless exercise to undertake any standing analysis here as to the sufficiency of those allegations. Our conclusion that the Notice is "interpretative" necessarily moots any further question of standing as to this Count.
 
 IV
 Count II
 
 48
 Count II alleges that the Commissioner's rule declaring the patentability of animals exceeds the authority delegated to the Commissioner under the patent statute. Thus, the allegation is that the Notice was issued in contravention of section 706(2)(C) of the APA, which reads:
 
 
 49
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 
 
 50
 * * * * * *
 
 
 51
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 52
 * * * * * *
 
 
 53
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]
 
 
 54
 5 U.S.C. Sec. 706(2)(C). (Emphasis added.) As relief for this alleged violation, appellants seek a declaration that "animals" are not patentable subject matter under section 101 and an injunction against the issuance of any "animal" patents.
 
 A.
 Injury-in-Fact to Farmers and Farm Groups
 
 55
 As personal injury, various appellants, namely WFFDF, HFA,[12] and the individual farmers, assert economic injury from the Commissioner's allegedly erroneous interpretation of section 101.[13] The individual farmers, John Kinsman and Michael Cannell, allege in the complaint that:
 
 
 56
 Defendants' rule will increase Kinsman and Cannell's costs of operation, by forcing them to pay royalties to purchase patented, genetically altered animals, and, alternatively, will render Kinsman and Cannell less able to compete in the production of uniform and predictable traits and products, thereby lowering their annual net profits, all to their economic harm....
 
 
 57
 Similarly, WFFDF alleges on behalf of its members[14] that economic injury will result from defendant's rule because:
 
 
 58
 Said rule will: increase such members' costs of operation by forcing them to purchase high priced "patented" animals, or lose profits producing genetically inferior "unpatented" animals; substantially increase livestock productivity and decrease herd size, causing a significant reduction in the number of small farms and negatively impacting their communities; substantially increase the economic competition that said members presently encounter, render these members unable or less able to compete in producing uniform and predictable traits or products; accelerate farm consolidation; and drive many of these members out of the farming business altogether.
 
 
 59
 As these appellants point out, the Commissioner concedes that the above allegations of economic injury, which must be assumed to be true, suffice to establish a judicially cognizable personal injury to them. See Association of Data Processing Serv. Orgs. Inc., 397 U.S. at 152, 90 S.Ct. at 829. However, the Commissioner challenges causation; that is, whether these parties could possibly prove that these identified economic injuries can be attributed to the Commissioner's allegedly unlawful issuance of patents.
 
 
 60
 The element of causation requires a party to show that "the injury must be fairly traceable to the challenged action." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Appellants here point to the holdings in Wright, Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), and other authorities which recognize that the injury to plaintiffs may be the consequence of government action affecting the acts or decisions of a third party who then causes injury or threatens injury to the plaintiff. The government counters with precedent, also citing Wright for support and further citing Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), which found plaintiffs without standing because the injury depended upon independent actions of third parties, not before the court, which were speculative, that is, not controlled by the government action. Under such circumstances, the injury is not "fairly traceable" to the government's action. As stated in Simon, 426 U.S. at 41-42, 96 S.Ct. at 1926, "[A] federal court act[s] only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." We conclude that the alleged economic injuries of the farmers and farm groups are not "fairly traceable" to the Commissioner's action.
 
 
 61
 It is readily apparent that because the alleged injuries depend upon issuance of a patent, such injuries are speculatively dependent at a minimum on the acts of potential inventors who must develop novel transgenic non-naturally occurring animals, specifically farm animals; who must decide to file an application for patent on those animals rather than, for example, maintaining their discoveries as trade secrets; and who must ultimately successfully prosecute such applications to issuance as a patent. Appellants would, nevertheless, link such third party action to the government because inventors have been "encouraged" to seek patent protection by the Notice.
 
 
 62
 The Court's reasoning in the previously mentioned Simon case is applicable here. In Simon, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court vacated a judgment upholding the invalidation of a revenue ruling which permitted hospitals to retain "charitable organization" status for tax purposes even though they did not automatically accept indigent persons for treatment. The Supreme Court held that the government's motion to dismiss by reason of the plaintiffs' want of standing should have been granted. Plaintiffs (respondents before the Court) were several low income individuals and organizations representing such individuals, who had brought a class action suit against the Secretary of the Treasury and the Commissioner of Internal Revenue (collectively "IRS") on behalf of all persons unable to afford hospital services. In their complaint, plaintiffs alleged that this revenue ruling "encouraged" hospitals to deny services to indigents, and was invalid as an erroneous interpretation of the Internal Revenue Code, as well as for failure to comply with the notice and public comment provisions in section 553 of the APA. The Supreme Court held the respondents lacked standing because they had not alleged an injury "that fairly can be traced to the challenged action [the revenue ruling], and not injury that results from the independent action of some third party not before the court." Id. at 41-42, 96 S.Ct. at 1926. The Court explained:
 
 
 63
 The complaint here alleged only that petitioners, by the adoption of Revenue Ruling 69-545, had "encouraged" hospitals to deny services to indigents. [Footnote omitted.] The implicit corollary of this allegation is that a grant of respondents' requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would "discourage" hospitals from denying their services to respondents. But it does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire.
 
 
 64
 Id. at 42, 96 S.Ct. at 1926.
 
 
 65
 Given the action taken by the IRS, the Revenue Ruling granting hospitals favorable tax treatment, and the injury alleged, denial of hospital services to indigents, the Court concluded that "it [was] purely speculative whether the denials of service specified fairly can be traced to [the IRS]'s encouragement or instead result from decisions made by hospitals without regard to tax implications." Id. at 42-43, 96 S.Ct. at 1926 (emphasis added). The Court further noted as "speculative at best" the respondents' allegations that overturning the Revenue Ruling and retracting favorable tax treatment would result in hospitals admitting indigents even given the favorable inference that some hospitals are so financially dependent upon the favorable tax treatment afforded charitable organizations that they would admit respondents as a condition to receipt of tax treatment. Id. Finally, the Court explained that the principle that "unadorned speculation" will not suffice for Article III standing, which the Court had set out in its prior decisions in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) and Linda R.S. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), controlled the case.
 
 
 66
 The Court also appears to have based its decision at least in part on the lack of a likelihood that the indigents' injuries would be redressed by a favorable decision. Consideration of the effectiveness of a remedy may well further illuminate whether the alleged illegal action caused the injury. See Wright, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19. After concluding that the injury was not fairly traceable, the Court continued by stating that the complaint suggests no substantial likelihood that victory in this suit would result in the indigent plaintiffs receiving the hospital treatment that they desire. Simon, 426 U.S. at 45-46, 96 S.Ct. at 1927-28.
 
 
 67
 Thus, the Court directed that the complaint in Simon be dismissed for want of standing because "[s]peculative inferences [were] necessary to connect [indigents'] injury to the challenged actions of the [IRS]." Id. In the case at bar, we conclude that the injuries of the farmers cannot fairly be traced to the encouragement of third parties to engage in research and development. Like the third party action in Simon, the action of inventors and investors resulting from the Commissioner's "encouragement" is highly speculative. See also Wright, 468 U.S. at 757-58, 104 S.Ct. at 3327-28 (Plaintiffs had no standing on a motion to dismiss to challenge as racially discriminatory IRS guidelines set out for private schools to receive tax exempt status under 26 U.S.C. Sec. 501(a), (c)(3). The alleged injury was not fairly traceable to the guidelines where plaintiffs made no allegation the number of private schools to be affected by withdrawal of tax exempt status was sufficient to make an appreciable difference in public school integration, where it was speculative whether withdrawal of tax exemption for any particular school would lead the school to change its policies, and where it was just as speculative whether any given parents of a child attending a private school would choose to transfer their child based on threatened loss of tax exempt status.); Blum v. Yaretsky, 457 U.S. 991, 1001, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) (nursing home residents did not have standing to challenge the threat of transfers to higher levels of care because assessing such possibility would be going into the area of speculation and conjecture).
 
 
 68
 As previously indicated, the farmers' alleged injuries are (1) having to pay increased costs in the form of royalties on patented animals and (2) suffering decreased profits because of competition from more productive non-naturally occurring animals. With respect to the alleged "royalties" injury, farmers cannot be forced to purchase improved animals and pay the premium (i.e., "royalty") which the farmers say is likely to be asked. Indeed, their allegation that their costs of operation will increase by reason of "royalties" is at best speculative. The motivation to purchase normally arises from the prospect of an economic advantage. Further, the ability of a market participant to affect price, i.e., exert market power, depends on whether competitive patented or non-patented animals are available. This in turn depends on the speculative activities of third party competitors whose market actions would determine the existence and extent of acceptable, noninfringing substitutes in the relevant product market. See Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 37 n. 7, 104 S.Ct. 1551, 1571 n. 7, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring); Mozart Co. v. Mercedez-Benz of North America, 833 F.2d 1342, 1346 n. 4 (9th Cir.1987) cert. denied, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988); A.I. Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673, 676 (6th Cir.1986); Allen-Myland, Inc. v. International Business Mach. Corp., 693 F.Supp. 262, 269 (E.D.Pa.1988); see also, State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 12 USPQ2d 1026 (Fed.Cir.1989) cert. denied, --- U.S. ----, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990); Note, The Presumption of Economic Power for Patented and Copyrighted Products in Tying Arrangements, 85 Colum.L.Rev. 1140, 1156 (1985). Such speculation as to market actors and their activities further beclouds the issue of causation as it concerns the farmers' alleged economic injury.
 
 
 69
 Similarly, the farmers' alleged injury from increased competition can only result from the development and commercialization of genetically improved animals--not from the grant of a patent. We do not denigrate the stimulation of invention that the possibility of patent protection provides. See Bonito Boats, Inc. v. ThunderCraft Boats, Inc., 489 U.S. 141, 146, 109 S.Ct. 971, 975, 103 L.Ed.2d 118 (1989); Chakrabarty, 447 U.S. at 307, 100 S.Ct. at 2206; Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 480-81, 94 S.Ct. 1879, 1885-86, 40 L.Ed.2d 315 (1974); Universal Oil Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944). However, were we to enjoin issuance of patents for non-naturally occurring animals, the requested relief would not prevent the development of such animals. It should hardly need saying that the issuance of a patent gives no right to make, use or sell a patented invention,[15] or that the absence of a patent creates no legal prohibition against continued research or development. As the Supreme Court so eloquently pointed out in Chakrabarty, 447 U.S. at 317, 100 S.Ct. at 2212:
 
 
 70
 The grant or denial of patents on micro-organisms is not likely to put an end to genetic research or to its attendant risks. The large amount of research that has already occurred when no researcher had sure knowledge that patent protection would be available suggests that legislative or judicial fiat as to patentability will not deter the scientific mind from probing into the unknown any more than Canute could command the tides. Whether respondent's claims are patentable may determine whether research efforts are accelerated by the hope of reward or slowed by want of incentives, but that is all.
 
 
 71
 This perceptive comment is of no less force just because we are faced now with genetically altered animals. It is equally apt. Research and commercialization of genetically improved animals may be stimulated by the Commissioner's interpretation, even if wrong. But appellants do not assert, indeed cannot assert, a legal right to be free from the competition attendant the development of improved animals.
 
 
 72
 We are unpersuaded to reaching a contrary result under the authorities cited by appellants where the Supreme Court found standing to exist. In Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the alleged threatened injury to Medicaid patients residing in a nursing home was found to be "quite realistic" in that decisions had actually been made to transfer others similarly situated, including at least one member of the plaintiff class, to a lower level of care under allegedly improper procedures. The threatened injury engendered by the application of such procedures was merely delayed and not a speculative possibility, such as is present in this case. See also Wilderness Soc'y v. Griles, 824 F.2d 4, 12 n. 8 (D.C.Cir.1987).
 
 
 73
 Appellants also erroneously believe that SCRAP supports their position on standing. In SCRAP "although the injury was indirect and there was [an] attenuated line of causation, 412 U.S. at 688, 93 S.Ct. at 2416, the complaint nevertheless alleged a specific harm flowing from the agency action" of approving an increase in freight rates. Simon, 426 U.S. at 45 n. 25, 96 S.Ct. at 1927 n. 25 (emphasis added). As explained by the Court in Simon, while the principle that indirectness of injury, such as was present in SCRAP, itself is not necessarily fatal to standing, such indirectness may make it substantially more difficult to establish standing: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm where speculative inferences are necessary to connect the injury to the challenged actions of appellants. Id.; see also Griles, 824 F.2d at 12, 15-16. Here, following the Supreme Court's reasoning in Simon, we conclude that the alleged economic injuries of individual farmers and farm organizations are not "fairly traceable" to the allegedly erroneous interpretation of the statute by the Commissioner.
 
 B.
 
 74
 Injury-in-Fact to Animal Protection Associations
 
 
 75
 The standing allegations of the animal protection associations are patently insufficient under controlling precedent. As the various appellants correctly point out, the alleged injury need not be economic in nature to constitute "injury" for purposes of standing.
 
 
 76
 [T]he interests alleged to have been injured "may reflect 'aesthetic, conservational, and recreational' as well as economic values." But broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.
 
 
 77
 Sierra Club, 405 U.S. at 738, 92 S.Ct. at 1368 (quoting Association of Data Processing Serv. Org., 397 U.S. at 154, 90 S.Ct. at 830). However, as the Supreme Court held in Sierra Club, 405 U.S. at 740, 92 S.Ct. at 1369, the APA does not "authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process." See also International Primate Protection League v. Administrators of the Tulane Educational Fund, 895 F.2d 1056, 1060 (5th Cir.) cert. granted, --- U.S. ----, 111 S.Ct. 507, 112 L.Ed.2d 520 (1990); Animal Lovers Volunteer Ass'n v. Weinberger, 765 F.2d 937, 938-39 (9th Cir.1985). HFA and AVAR assert only a general interest in preventing cruelty to animals. That these appellants allege they will expend more dollars on organizational activities and expenses as a result of the Notice does not serve to distinguish them from any member of the public with a particularized conviction about protecting animals. As the court stated in Sierra Club, 405 U.S. at 739, 92 S.Ct. at 1368:
 
 
 78
 If any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.
 
 
 79
 Thus, HFA and AVAR have failed to allege any legally cognizable injury.
 
 
 80
 ASPCA and MHS attempt to escape from the mere "value preference" category by reason of state statutes that delegate to these organizations certain police power to protect and care for animals. They allege they will need to increase their budgets and enforcement staffs by reason of the increased experimentation on animals fostered by the potential for patent protection. The government counters this point first by uncontroverted assertions that the state statutes impose no duties on the organizations so that any action they might take would be purely voluntary, and thus, no different from the action of anyone interested in protecting animals. Nevertheless, we recognize that courts have found the type of allegations made by ASPCA and MHS here sufficient for showing personal injury. See, e.g., International Primate Protection League, 895 F.2d at 1059-60 & n. 4; Humane Soc'y of Rochester v. Lyng, 633 F.Supp. 480, 485 (W.D.N.Y.1986); see also Washington Utils. & Transp. Comm'n v. Federal Communications Comm'n, 513 F.2d 1142, 1154 n. 17 (9th Cir.1975) (statute imposing voluntary obligation on association sufficient to distinguish association from general public). We will presume these allegations of personal injury are sufficient to meet the initial requirement.
 
 
 81
 Turning to causation, however, we conclude that the injury alleged by these groups cannot be attributed to the Commissioner's interpretation of section 101 under the reasoning of the Supreme Court's decision in Simon previously discussed. With respect to these associations, not only does the need for action by independent third parties, who must successfully invent and prosecute to issuance patent applications for "animals," sever any link between the injury and governmental action, see supra at 933-934, but also additional acts by third parties are required. The potential for patent protection leading to increased experimentation must lead to increased cruelty. Yet for increased experimentation to lead to increased cruelty, appellants would have to allege that the existing animal cruelty laws are insufficient or that the issuance of "animal" patents would "encourage" researchers to disobey these laws. See, e.g., Animal Welfare Act of December 23, 1985, Pub.L. No. 99-198, 99 Stat. 1645 (1985), 9 C.F.R. Secs. 1.1-12.10 (1990) (Regulations concerning animal welfare and implementing the Animal Welfare Act, specifically 9 C.F.R. Secs. 3.1-3.142 with respect to standards for humane handling, care and treatment); N.Y.Pub.Health Law Sec. 504 (1990); Cal.Penal Code Sec. 597 (1991); see also International Primate Protection League v. Institute for Behavioral Research, Inc., 799 F.2d 934, 936-39 (4th Cir.1986) (discussion of Animal Welfare Act and federal regulation). We cannot baldly speculate by favorable inference that researchers would likely disregard applicable animal protection laws because of the Notice. See Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); O'Shea v. Littleton, 414 U.S. 488, 496-97, 94 S.Ct. 669, 676-77, 38 L.Ed.2d 674 (1974) (no standing where injury not sufficiently real and immediate because it anticipates violation of lawful criminal statutes and being tried for the offense). Without such allegations, ASPCA and MHS have also failed to allege an injury "fairly traceable" to the Commissioner's interpretation of section 101.
 
 V
 Zone of Interests
 
 82
 The Supreme Court has enunciated one further limitation on standing known as the "zone of interests" test. A party bringing suit must come "within the zone of interests addressed by the substantive provisions of the law they seek to invoke." Air Courier Conference, --- U.S. ----, 111 S.Ct. 913, 112 L.Ed.2d 1125; Sierra Club, 405 U.S. at 733, 92 S.Ct. at 1365; Association of Data Processing Servs. Org., 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).
 
 
 83
 Appellants invoke section 702 of the APA which gives standing to any person "adversely affected or aggrieved by an agency action within the meaning of a relevant statute." 5 U.S.C. Sec. 702. Consequently, to fall within the "zone of interests" protected by section 702, it is necessary to be within the "zone of interests" addressed by a "relevant statute." Pointing to both the APA and the patent laws generally, appellants argue that they fall within the zone of interests protected by either statute. We reject appellants' position. The patent statute, not section 706(2)(C) nor 553 of the APA, is the "relevant statute" under section 702, and appellants have not alleged facts which place them within the "zone of interests" addressed by the patent laws.
 
 
 84
 Appellants would have us consider the APA itself as a "relevant statute" under section 702. The Supreme Court has given recent guidance on the meaning of "relevant statute" in section 702 of the APA. In Lujan v. National Wildlife Federation, --- U.S. ----, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the plaintiffs had sought to rely on section 706 of the APA as a "relevant statute," as well as on two other statutes, the Federal Land Policy Management Act of 1976 (FLPMA) and the National Environmental Policy Act of 1969 (NEPA). Id. 110 S.Ct. at 3182. Only the latter two were held to be relevant. As defined in Lujan, 110 S.Ct. at 3187,
 
 
 85
 [t]he relevant statute is, of course, the statute whose violation is the gravamen of the complaint--both the FLPMA and NEPA.
 
 
 86
 See also Air Courier Conference, --- U.S. at ----, 111 S.Ct. at 917. Thus, an alleged violation of appellants' reliance on section 706 of the APA as a "relevant statute" is misplaced.
 
 
 87
 We believe the above analysis applies equally to eliminate appellants' reliance on section 553 of the APA as a basis for establishing they are within a zone of interest. Moreover, in rejecting an argument that plaintiffs were injured by not having the benefit of section 553 notice and comment, the Court of Appeals for the District of Columbia Circuit in Capital Legal Foundation v. Commodity Credit Corp., 711 F.2d 253, 260 (D.C.Cir.1983) reasoned:
 
 
 88
 Were we to accept [Capital's] imaginative argument, every asserted violation by an agency of its own regulations could be recharacterized as "de facto rulemaking" outside the APA, and therefore arguably open to challenge as procedurally-flawed by any person who claims he, she, or it would have participated had the rulemaking occurred inside the APA. We are certain that Congress, in adopting the APA, had no such universal standing design in mind. [Footnote omitted.]
 
 
 89
 See also Simon, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1971) (plaintiffs contended section 553 of APA was violated by revenue ruling, Supreme Court dismissed for lack of standing under Internal Revenue Code); Griles, 824 F.2d at 19. The court in Capital, in a footnote, further explicated that the relevant legislative history concerning the APA standing provision indicated challengers had to be substantively interested in the agency's product or outcome. Id. at n. 17. We agree with this analysis as well. Indeed, were appellants able to rely on section 553 of the APA as a "relevant statute," the "zone of interest" limitation would be rendered nugatory whenever a violation of that section is alleged. Because the "zone of interests" is intended to be a further limitation on standing, see Association of Data Processing Servs. Org., 397 U.S. at 153, 90 S.Ct. at 830, we reject an interpretation of section 702 that effectively eliminates the "zone of interest" test.
 
 
 90
 Here, if appellants are to be deemed within the "zone of interests" for standing purposes under section 702 of the APA, they must fall within the "zone of interests" addressed by the patent laws. Appellants baldly claim that they fall within the "zone of interests" addressed by the patent laws because patents "are issued not for private benefit but for the public good" and that "[p]atent case law emphasizes the importance of the public interest and the constitutional requirement of a public benefit." Under appellant's theory, it would follow that since appellants represent "members of the public who will suffer injury due to the new [and wrongful] PTO rule," they are "arguably within the zone of interests" protected by the Patent Act. In essence appellants' claim the patent statute's "zone of interests" encompasses any member of the public who perceives they will be harmed by an issued patent which they believe to be invalid. We cannot agree that the "zone of interests" of the patent laws is so broad. Under such an interpretation, we would, for example, be opening the door to collateral attack on the validity of issued patents; any competitor could simply file suit against the Commissioner challenging a patent's validity. This we decline to do. The structure of the Patent Act indicates that Congress intended only the remedies provided therein to ensure that the statutory objectives would be realized. See, e.g., 35 U.S.C. Secs. 281-282 (in civil action for infringement, validity of patent can be challenged defenses); 145 (civil action to obtain patent); 146 (civil action in case of interference); 135 (interference action; subsection (c) provides that discretionary actions by the Commissioner under that subsection are reviewable under section 10 of the APA); 291 (civil action in case of interfering patents); 301-02 (reexamination proceedings).
 
 
 91
 We see much similarity between the situation here and that in Block v. Community Nutrition Inst., 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), where consumers were not allowed to challenge certain milk marketing orders issued by the Secretary of Agriculture. As stated therein, actions by concerned members of the public "might themselves frustrate achievement of the statutory purposes." Id. at 352, 104 S.Ct. at 2457. In sum, we conclude that none of the appellants have alleged sufficient facts to establish that they are within the "zone of interests" of any "relevant statute."
 
 VI
 
 92
 Accepting the allegations of the complaint as true and drawing all inferences favorable to appellants, we conclude that appellants have failed to allege facts sufficient to meet the standing requirements of Article III Sec. 2 of the Constitution.
 
 
 93
 AFFIRMED ON OTHER GROUNDS.
 
 
 
 [1]
 This case was originally heard by a five-judge panel as authorized under 28 U.S.C. Sec. 46(c) (1988)
 
 
 [2]
 We attach no legal significance to a difference in these terms and use them interchangeably herein. There is no contention that the Notice does not fall within the APA definition of "rule" in 5 U.S.C. Sec. 551(4) (1988)
 
 
 [3]
 The various plaintiffs in this case are nine:
 Animal Legal Defense Fund (ALDF), The American Society for the Prevention of Cruelty to Animals (ASPCA), The Marin Humane Society (MHS), Wisconsin Family Farm Defense Fund (WFFDF), John Kinsman, Michael Cannell, Humane Farming Association (HFA), Association of Veterinarians for Animal Rights (AVAR), and People for the Ethical Treatment of Animals (PETA).
 
 
 [4]
 The Rule covers only non-naturally occurring animals; plaintiffs erroneously speak of the Rule as covering all "animals."
 
 
 [5]
 The parties do not dispute here the legality of the Ninth Circuit's transfer and do not question whether a suit seeking compliance with the APA notice and comment provisions in administering the patent laws is a suit "arising under" the patent laws in accordance with 28 U.S.C. Sec. 1338(a) (a necessary prerequisite for Federal Circuit jurisdiction under Sec. 1295(a)(1)). See U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 700-01 (Fed.Cir.1988), cert. denied, 490 U.S. 1068, 109 S.Ct. 2070, 104 L.Ed.2d 635 (1989). The case having been transferred from the Ninth Circuit on these grounds, we do not address this issue ourselves, as we are wary of the Supreme Court's recent admonition against circuit courts playing ping pong with an appeal. See Christianson v. Colt Indus., Inc., 486 U.S. 800, 818, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988)
 
 
 [6]
 Granfinanciera v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 2788, 106 L.Ed.2d 26 (1989) (appellee can raise issue raised below to support judgment on appeal). A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim may rest on plaintiffs' lack of standing. 2A J. Moore, Moore's Federal Practice, p 12.07 [2.-5] (1989); see also Grider v. Texas Oil & Gas Corp., 868 F.2d 1147, 1151 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); Fors v. Lehman, 741 F.2d 1130, 1132 (9th Cir.1984); Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981); Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir.1976); Blackhawk Heating & Plumbing Co. v. Driver, 433 F.2d 1137, 1140 (D.C.Cir.1970)
 
 
 [7]
 In light of our disposition of the legal question whether the Notice is "substantive" or "interpretative" under section 553, we do not address appellees' argument that actual injury cannot rest solely on allegations of denial of input into the rulemaking process. See, e.g., Capital Legal Foundation v. Commodity Credit Corp., 711 F.2d 253, 260 (D.C.Cir.1983)
 
 
 [8]
 It is interesting to note that the first patent on a non-naturally occurring animal issued within a month after this court affirmed the Allen decision. See U.S. Patent No. 4,736,866 (issued April 12, 1988) (The "Harvard mouse")
 
 
 [9]
 None of the plaintiffs here argue that the inclusion of the express limitation on the interpretation of section 101 as not applicable to humans serves to make the Rule "substantive" rather than "interpretative," nor could they based on their allegations. Indeed, all the appellants' allegations of injury, procedural, economic and organizational, focus on the treatment of animals or the adverse economic effects resulting from the issuance of patents on animals. Thus, the question whether section 553 requirements extend to that part of the Rule which precludes the patentability of humans is not in issue and we do not address it
 
 
 [10]
 While the Commissioner may sit on the Board, in that capacity he serves as any other member. See 35 U.S.C. Sec. 7(a)
 
 
 [11]
 Allowance will to some extent reduce the opportunities for the Board to revisit the question of section 101 subject matter but that does not effect a change in procedures or substantively affect any rights. In fact, the reduction of the Board's opportunities for revisiting Allen is limited to applications where the examiner makes no final rejection. In cases where a rejection on another basis is made and the applicant appeals, the Board may revisit Allen by deciding to enter a new rejection based on section 101. See 37 C.F.R. Sec. 1.196 (1990)
 
 
 [12]
 Since this appeal is from a motion to dismiss, we must, as previously stated, draw all inferences favorable to appellants. Thus, we interpret HFA to assert an economic injury to its member farmers similar to that alleged by WFFDF
 
 
 [13]
 The District Court viewed the Count II issue, once determining that the rule was "interpretative" under section 553(b)(A), as having been reduced to whether the Commissioner had authority to issue a non-binding Notice reflective of Board decisional precedent. Were that the proper inquiry, we would agree with the district court that because the Notice is interpretative under section 553(b)(A) of the APA:
 [T]he PTO is authorized to issue such rules or "notices," 5 U.S.C. section 553, and because the Rule neither abridges nor enlarges the rights of anyone the PTO could not, as a matter of law, have exceeded its statutory authority in promulgating it.
 Animal Legal Defense Fund, 710 F.Supp. at 732, 9 USPQ2d at 1819.
 Nevertheless, as on motion to dismiss for want of standing we must draw all reasonable inferences in favor of appellants based on the allegations in the complaint, we assume that, as Count II of the complaint alleges, the Notice represents the Commissioner's independent interpretation of section 101.
 
 
 [14]
 We take as true for purposes of reviewing a motion to dismiss, that WFFDF's organizational purposes and activities, as somehow documented by its by-laws or the like, encompass the protection of farmer members from economic injury. Thus, WFFDF stands in the shoes of its members. See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342-43, 97 S.Ct. 2434, 2440-41, 53 L.Ed.2d 383 (1977)
 
 
 [15]
 A patent provides only a right to exclude others from practicing the invention for a limited time. See 35 U.S.C. Sec. 154; Eli Lilly and Co. v. Medtronic, Inc., --- U.S. ----, 110 S.Ct. 2683, 2688, 110 L.Ed.2d 605, 15 USPQ2d 1121, 1126 (1990); Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 215, 100 S.Ct. 2601, 2622, 65 L.Ed.2d 696 (1980)